**UNITED STATES of America**

**v.**

**Carmine PERSICO, a/k/a "The Snake," a/k/a "Junior," Gennaro Langella, a/k/a "Gerry Lang," Thomas DiBella, a/k/a "The Old Man," Alphonse Persico, a/k/a "Little Allie Boy," Dominic Montemarano, a/k/a "Donny Shacks," John J. DeRoss, a/k/a "Jackie," Frank Melli, a/k/a "Beansie," Anthony Scarpati, a/k/a "Scappy," Andrew Russo, a/k/a "Andy Mush," Dominic Cataldo, a/k/a "Little Dom," Frank Falanga, a/k/a "Frankie The Beast," Hugh McIntosh, a/k/a "Apples," Vito Pitta and Ralph Scopo, Defendants.**

No. S 84 Cr. 809 (JFK).

United States District Court,
S.D. New York.

Oct. 2, 1985.

---

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., for United States; Bruce A. Baird, Aaron R. Marcu, Frank H. Sherman, Asst. U.S. Attys., New York City, of counsel.

Frank A. Lopez, Brooklyn, N.Y., for defendant Carmine Persico.

David A. DePetris, New York City, for defendant Gennaro Langella.

Slotnick & Cutler, P.C., New York City, for defendant Thomas DiBella; Bruce Cutler, of counsel.

DePetris, Meyer & Diesenhouse, New York City, for defendant Alphonse Persico; Stanley M. Meyer, of counsel.

Harold J. Boreanaz, Buffalo, N.Y., for defendant Dominic Montemarano.

Dennis J. Peterson, Staten Island, N.Y., for defendant John J. DeRoss.

Charles L. Emma, Brooklyn, N.Y., for defendant Frank Melli.

Jacob R. Evseroff, Brooklyn, N.Y., for defendant Anthony Scarpati.

Santangelo & Cohen, New York City, for defendant Andrew Russo; George L. Santangelo, of counsel.

Michael F. Coiro, Jr., Bellmore, N.Y., for defendant Dominic Cataldo.

Bryan F. Levinson, Kew Gardens, N.Y., for defendant Frank Falanga.

Susan G. Kellman, New York City, for defendant Hugh McIntosh.

Stillman, Friedman & Shaw, P.C., New York City, for defendant Vito Pitta; Edward M. Shaw, of counsel.

Slotnick & Cutler, P.C., New York City, for defendant Ralph Scopo; Barry I. Slotnick, of counsel.

## OPINION and ORDER

KEENAN, District Judge:

The fourteen defendants are alleged to be members and associates of the Colombo Family of La Cosa Nostra ("Colombo Family"). The Colombo Family allegedly is a criminal enterprise that systematically engaged in a wide-range of criminal activities including payoffs, embezzlement and extortion in connection with its control and domination of local labor unions; theft; sale of stolen goods; loansharking; illegal distribution of naroctics; operation of an illegal gambling business; bribery of public officials; and, intimidation by threats, beatings and murder. Counts one and two of the 51-count indictment, which constitute the heart of the government's case, charge all

fourteen defendants with substantive violations of, and conspiracy to violate, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).

In connection with the indictment, defendants have filed a wide variety of motions. Each shall be dealt with below.[1]

### A. *Joinder/Severance*

Defendants Langella, Scarpati and Melli contend they are improperly joined in this indictment under Rule 8(b) of the Federal Rules of Criminal Procedure ("F.R.Cr.P."). In the alternative, these defendants, together with defendants Alphonse Persico, Russo, McIntosh, Pitta and Scopo, seek a severance pursuant to F.R.Cr.P. 14. Defendants Carmine Persico, Langella and Scopo move for an order pursuant to F.R. Cr.P. 13 severing a portion of the indictment and joining it for trial with the indictment in *United States v. Salerno*, S 85 Cr. 139 (RO). For the reasons stated below, these motions are denied.

#### 1. *Misjoinder*

Rule 8(b) of the Federal Rules of Criminal Procedure governs joinder in multiple defendant cases, *e.g., United States v. Turbide*, 558 F.2d 1053, 1061 n. 7 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977). It provides:

Two or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

■■■■ Rule 8(b) permits joinder of crimes arising out of a common scheme or plan. *See, e.g., United States v. Weisman*, 624 F.2d 1118, 1129 (2d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91

1. On July 23, 1985, 620 F.Supp. 836, this Court issued an opinion and order disposing of other pretrial motions which were subject to interlocutory appeal. On September 17, 1985, the Court

of Appeals for the Second Circuit, 774 F.2d 30, affirmed this Court's order with respect to those motions.

(1980); *United States v. Ricco,* 549 F.2d 264, 271 (2d Cir.), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977); *United States v. Bernstein,* 533 F.2d 775, 789 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976); *United States v. Scott,* 413 F.2d 932, 935 (7th Cir.1969), *cert. denied,* 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970); *United States v. Clemente,* 494 F.Supp. 1310, 1324 (S.D.N.Y.1980). It applies to substantive offenses, as well as to conspiracies. Two or more conspiracies may be joined under Rule 8 so long as they are related as part of a common scheme. *United States v. Borelli,* 336 F.2d 376, 387 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). A conspiracy charge "provides a common link and demonstrates the existence of a common plan" for purposes of Rule 8(b). *Bernstein,* 533 F.2d at 789. Joinder of otherwise separate acts may be allowed when the acts are properly linked by means of a conspiracy charge. *United States v. Welch,* 656 F.2d 1039, 1051 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982); *United States v. Luna,* 585 F.2d 1, 4 (1st Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978); *United States v. Adams,* 581 F.2d 193, 197 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978).

In much the same way, a RICO charge provides the unifying link among the substantive crimes making up a pattern of racketeering activity for purposes of their joinder under Rule 8(b). *United States v. Tashjian,* 660 F.2d 829, 833 (1st Cir.), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); *Welch,* 656 F.2d at 1051; *see Weisman,* 624 F.2d at 1129; *United States v. Napolitano,* 552 F.Supp. 465, 478 (S.D.N.Y.1982). The racketeering counts almost by definition constitute "a 'series of acts or transactions' sufficiently intertwined to permit a joint trial of all defendants" under Rule 8(b). *United States v. Bagaric,* 706 F.2d 42, 69 (2d Cir. 1983). The Second Circuit has observed:

> If ... the [predicate acts] could properly be considered part of a "pattern of racke-

teering activity," we see no reason why they could not similarly constitute part of a "series of acts or transactions constituting an offense" within the meaning of Rule 8(b). Indeed, a construction of Rule 8(b) that required a closer relationship between transactions than that necessary to establish a "pattern of racketeering activity" under RICO might possibly prohibit joinder in circumstances where Congress clearly envisioned a single trial.

*Weisman,* 624 F.2d at 1129.

All the defendants are charged in the RICO substantive and conspiracy counts (counts one and two) and all are charged with participating in the affairs of the same illegal enterprise, to wit, the Colombo Family. Accordingly, joinder appears proper in this case.

Concededly, each defendant is not charged in every count of the indictment. Rule 8(b), however, expressly provides that "all defendants need not be charged in each count." *See United States v. Barton,* 647 F.2d 224, 239–40 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Scotto,* 641 F.2d 47, 58 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); *Weisman,* 624 F.2d at 1129. Nor is it significant that each defendant is not charged with committing or agreeing to commit every predicate act in the RICO counts. Even in the case of a non-racketeering conspiracy, an indictment need not allege that every defendant participated in each act or transaction, *Scott,* 413 F.2d at 934–35, and joinder is proper even if different defendants participate in different parts of an overall scheme or conspiracy. *United States v. Perez,* 489 F.2d 51, 62 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); *Borelli,* 336 F.2d at 387; *United States v. Mandel,* 415 F.Supp. 1033, 1047 (D.Md.1976).

Accordingly, defendants' motion for dismissal or severance based on misjoinder under Rule 8(b) is denied.

### 2. *Severance*

■ It is well settled that "persons jointly indicted may be jointly tried.... 'to [conserve] judicial resources, [alleviate] the burdens on citizens serving as jurors, and [avoid] the necessity of having witnesses reiterate testimony in a series of trials.'" *United States v. Lyles*, 593 F.2d 182, 191 (2d Cir.) (*quoting United States v. Borelli*, 435 F.2d 500, 502 (2d Cir.1970), *cert. denied*, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971))), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *see United States v. Ventura*, 724 F.2d 305, 312 (2d Cir.1983); *Weisman*, 624 F.2d at 1129–30. This presumption in favor of joint trials is particularly strong where, as here, "the crime[s] charged involve a common scheme or plan." *United States v. Girard*, 601 F.2d 69, 72 (2d Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).

Defendants argue that the danger of "prejudicial spillover" and "guilt by association" counsel in favor of abandoning the general joint indictment-joint trial rule. The Court does not dispute that there exists some risk of prejudicial spillover in any multi-defendant trial. The degree of risk depends on the particular facts and circumstances of the case. In a case such as this, where all the defendants are charged with substantive racketeering offenses and participation in a racketeering conspiracy, the government would be entitled to offer evidence of the entire pattern of racketeering activity at each separate trial. This militates against defendants' claims of "prejudicial spillover." *United States v. Cunningham*, 723 F.2d 217, 230 (2d Cir.1983), *cert. denied*, 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984).

A joint trial serves several purposes. First, in a complex case like this, a joint trial permits the jury to see a comprehensive presentation of the entire enterprise and the role played by each participant therein. Second, a joint trial prevents the delay associated with separate, successive trials, thus serving the interests of "both the government and the accused." *United States v. McGrath*, 558 F.2d 1102, 1106 (2d

Cir.1977); *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978). Third, the Court must consider the safety of witnesses who, according to the government, would have to be called at each successive trial to repeat testimony. Inconvenience aside, the government has offered, through *ex parte* submissions, evidence that once the identity of its witnesses was revealed at the first trial, their safety could no longer be insured.

■ Thus, to justify a severance, a defendant must meet the "heavy burden," *United States v. Sotomayor*, 592 F.2d 1219, 1227 (2d Cir.), *cert. denied sub nom. Crespo v. United States*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979), of showing that "he would be so prejudiced by a joint trial that he would in effect be denied a constitutionally fair trial in a joint proceeding." *United States v. King*, 49 F.R.D. 51, 53 (S.D.N.Y.1970); *accord United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.), *cert. denied sub nom. Shipp v. United States*, —— U.S. ——, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). He must show that the prejudice resulting from joinder is "real," *United States v. Kahn*, 381 F.2d 824, 840 (7th Cir.), *cert. denied*, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967), and "substantial," *Ricco*, 549 F.2d at 274. In a case such as this, the showing of prejudice must be particularly cogent "to justify the disintegration of a trial ... in which there is cohesion of crime alleged, defendants charged and proof adduced." *Kahn*, 381 F.2d at 840. As Judge Weinfeld wrote in *United States v. Kahaner*, 203 F.Supp. 78, 81–82 (S.D.N.Y.1962), *aff'd*, 317 F.2d 459 (2d Cir.), *cert. denied*, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963):

The ultimate question is whether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence

that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.

*See, e.g., United States v. Uroquiza,* 575 F.Supp. 1538, 1540 (S.D.N.Y.1983) (Weinfeld, J.); *United States v. Shipp,* 578 F.Supp. 980, 995–96 (S.D.N.Y.1984) (Weinfeld, J.), *aff'd,* 754 F.2d 1427, 1432 (2d Cir. Jan. 16, 1985); *United States v. Kornblau,* 586 F.Supp. 614, 628 (S.D.N.Y.1984); *United States v. Mejia,* 578 F.Supp.·1541, 1551 (E.D.N.Y.), *aff'd mem. sub nom. United States v. Bermudez,* 751 F.2d 371 (2d Cir. 1984).

■ Separate trials are not justified simply because (i) in a joint trial evidence will be offered against one defendant which is not relevant to, or otherwise admissible against, another defendant, *Hanger v. United States,* 398 F.2d 91, 99–100 (8th Cir.1968), *cert. denied,* 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969); *Weisman,* 624 F.2d at 1130; or (ii) the defendants' roles in the conspiracy vary in scope or importance, *United States v. Aloi,* 511 F.2d 585, 598 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975); *United States v. Vega,* 458 F.2d 1234, 1236 (2d Cir.1972), *cert. denied,* 410 U.S. 982, 93 S.Ct. 1506, 36 L.Ed.2d 177 (1973). The question is whether the jury can "as a practical matter ... follow the court's admonitory instructions and accordingly ... collate and appraise the independent evidence against each defendant." *United States v. Campanale,* 518 F.2d 352, 359 (9th Cir.1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).

In this case, the Court sees no substantial danger that the jury will be misled as to what charges pertain to a particular defendant. The charges in this case can be readily broken down into twelve distinct areas of criminal activity. (See Government Memorandum, dated July 3, 1985, at iii–iv). These areas relate to the same enterprise, but are readily segregable. Moreover, the Court can instruct the jury to consider the guilt of each defendant individually. Such instructions, and the com-partmentalization of the indictment, will adequately protect the defendants from "prejudicial spillover." *See, e.g., United States v. Opper,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *Barton,* 647 F.2d at 239–41; *Weisman,* 624 F.2d at 1130; *United States v. Papadakis,* 510 F.2d 287, 300 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. DeSapio,* 435 F.2d 272, 280 (2d Cir.1970), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); *Kahaner,* 203 F.Supp. at 81–82; *United States v. Lev,* 22 F.R.D. 490, 493 (S.D.N.Y.1958), *aff'd,* 276 F.2d 605 (2d Cir.), *cert. denied,* 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960). Defendants' arguments to the contrary "take insufficient account of the intelligence and conscientiousness of the jury, the effective efforts of the judge to keep it on the beam, [and] the skill of defense counsel." *Lyles,* 593 F.2d at 190 (*quoting DeSapio,* 435 F.2d at 280).

#### a. *Langella*

Langella is alleged to have been the acting Boss of the Colombo Family. He is named in more racketeering acts and substantive counts than any other defendant. Langella is alleged to have participated in such diverse activities as loansharking, gambling, bribery, labor payoffs, and embezzlement. If any defendants in this case were to be prejudiced by being tried together, it would be those that had to stand trial with Langella, not Langella himself. His severance motion has no merit.

#### b. *Alphonse Persico*

Alphonse Persico is alleged to be a "made member" of the Colombo Family and, as the son of Carmine Persico, the alleged Boss of the Family, he supposedly occupies a special position of influence therein. Alphonse Persico is charged with participating in the Ashland, Kentucky bribery of a prison official. Alphonse Persico's bare allegation of "prejudicial spillover" is insufficient to justify severance, in view of his alleged position in the Family.

#### c. *Melli*

Melli is alleged to be a "Capo" in the Colombo Family. He is charged with par-

ticipating in labor payoffs, loansharking and interstate transportation of stolen property. Melli is not involved in any of the Title III intercepted conversations. His position in the Family and the broad range of illegal activities he is alleged to have participated in, however, counsel against his severance.

#### d. *Scarpati*

Like Melli, Scarpati is alleged to be a "Capo" in the Colombo Family. He is charged with loansharking. As with the defendants named above, his position in the Family would permit introduction of a broad range of evidence against him. To sever his trial would create needlessly duplicative presentations of evidence and might endanger witnesses.

#### e. *Russo*

Russo is also alleged to be a "Capo" in the Colombo Family. He is charged with bribery and loansharking in connection with the racketeering enterprise. He has failed to allege any real or substantial risk of "prejudicial spillover" and therefore his motion for severance is without merit.

#### f. *McIntosh*

McIntosh is alleged to be an associate of the Colombo Family. He is charged with bribery of public officials designed to benefit certain Family members. He makes only a bare allegation of "prejudicial spillover," with no specific showing of a real and substantial danger of prejudice absent severance. Thus, severance of his trial is unjustified.

#### g. *Pitta*

The indictment alleges that Pitta was an associate of the Colombo Family and that he used his position as a union official to further the business of that enterprise. Pitta is named in eight substantive counts and in ten acts of racketeering activity. Pitta's co-defendants in those counts—DeRoss, Falanga, DiBella, and Melli—are named in virtually all of the other areas of criminal activity charged in this case.

Pitta portrays himself as a union official charged with participating in a simple extortion and payoff scheme. While this is true, he depicts only a small part of the picture. Pitta is charged with engaging in the above-mentioned conduct on behalf of the Colombo Family. According to the government, Pitta owes his position in the union, and therefore his power to extort payoffs, to his relationship with the Family. Thus, whether Pitta is tried separately or with the other defendants, the government would be entitled to demonstrate the existence of the enterprise and Pitta's role therein in proving its RICO charges. Since the same evidence would be admitted at separate or joint trials, Pitta's claim of "prejudicial spillover" is unconvincing.

While Pitta was not the focal point of the Colombo Family, the indictment alleges that he played a significant role in the organization. Concededly, Pitta's role in the Family is somewhat distinct from the organization's alleged narcotics or gambling activities. But the government is attempting to root out an organization whose business it claims is crime. This is what Congress intended in enacting RICO. To compel the government to attack this alleged organization through seriatim trials would frustrate the intent of RICO by failing to provide juries with a complete picture of the business or needlessly compel duplicate presentations of evidence and endanger witnesses. The Court finds neither result tolerable or necessary. If the evidence against Pitta is as distinct from that against the other defendants as Pitta contends, then the Court is confident the jury can follow the Court's instruction to consider Pitta's culpability based solely on the evidence offered against him. His motion for severance is denied.

#### h. *Scopo*

Like Pitta, Scopo is charged with racketeering arising out of payoff demands and extortion engaged in as a union official. He is alleged to be a "made member" of the Colombo Family. The extortion and payoff charges against Scopo relate directly to Langella and Montemarano, who the government contends are two of the principal actors. Several taped conversations that will be offered in evidence relate di-

rectly to Scopo. A separate trial as to him would be unduly burdensome to the government and the Court. Scopo's motion for severance is without merit and is denied.

■ Considerations of judicial economy, safety of witnesses and the government's asserted need to try the defendants together to provide the jury a fair picture of the criminal activity of the Colombo Family, require a joint trial of all defendants. No defendant has demonstrated a real and substantial likelihood of "prejudicial spillover," not subject to a curative instruction. Accordingly, defendants' motions for severance are denied.

### 3. *Rule 13—Joinder for Trial*

Defendants Carmine Persico, Langella and Scopo move for an order, pursuant to Rule 13, severing racketeering act one, "Conspiracy to Extort Payoffs from Construction Companies," and count three, "Concrete Workers Extortion," and joining them for trial with the indictment in *United States v. Salerno,* S 85 Cr. 139 (RO). Under Rule 13, the court may order that separate indictments be tried together if the offenses and defendants could properly have been joined in one indictment. F.R. Cr.P. 13. The standard for consolidation of indictments against multiple defendants is Rule 8(b). *United States v. Cannington,* 729 F.2d 702, 710 (11th Cir.1984); *United States v. Martinez,* 686 F.2d 334, 338 (5th Cir.1982); *Daley v. United States,* 231 F.2d 123, 125 (1st Cir.) (per curiam), *cert. denied,* 351 U.S. 964, 76 S.Ct. 1028, 100 L.Ed. 1484 (1956). Accordingly, joinder of racketeering act one and count three with the indictment in *Salerno* would be proper if all are part of a single series of transactions, or arise out of a common scheme or plan. As the bill of particulars provided by the government makes clear, however, no such relation exists between the offenses charged in this case and those in the *Salerno* indictment.

Racketeering act one of the indictment in this case is alleged to be part of a pattern of racketeering through which the enterprise known as the Colombo Organized Crime Family was conducted. All of the defendants are charged in the RICO substantive and conspiracy counts of which racketeering act one is a predicate act. The *Salerno* indictment, however, alleges a different pattern of racketeering activity through which a separate and distinct enterprise known as the Commission of La Cosa Nostra was conducted. Only three of the defendants in this case are also defendants in *Salerno.* Conversely, seven defendants charged in *Salerno* with being members of the Commission are not defendants in this case. The enterprises alleged being distinct, separate entities, joint trial is unwarranted. *Cf. United States v. Russotti,* 717 F.2d 27, 32–34 (2d Cir.1983), *cert. denied, Marino v. U.S.,* 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984) (double jeopardy does not bar prosecution unless both enterprise and pattern of activity alleged in two indictments were the same).

Moreover, the conduct which forms the basis of racketeering act one and count three of the indictment in this case is not the conduct underlying the *Salerno* indictment. Each indictment alleges extortion of construction contractors in violation of the Hobbs Act, 18 U.S.C. § 1951. The *Salerno* indictment, however, alleges that the defendants in that case established a "Club" of contractors who cooperated, under coercion, with the allocation of construction contracts among them, and that the defendants therein extorted money from that "Club." The allegations in this case, on the other hand, do not involve such a group of contractors. Moreover, the conspiracy charged in this case was allegedly confined to extorting payoffs in connection with concrete pouring contracts of values less than two million dollars each; that alleged in *Salerno* involved contracts with values in excess of that amount. Finally, the money allegedly extorted by the defendants in this case was not divided among other organized crime families, remaining within the Colombo Family, while that in *Salerno* was allegedly divided among the Commission.

■ When these facts are combined with the difference in the membership of the alleged conspiracies in the two cases, it becomes clear that the offenses alleged do not arise from a common scheme or plan, or constitute a single series of transactions. They would not be properly joined in a single indictment and are not, therefore, properly tried together. Accordingly, the defendants' motion pursuant to Rule 13 is denied.

## B. *Duplicitous Indictment*

■ Defendants Langella, DiBella, Scarpati and McIntosh contend that the indictment is duplicitous, in that it impermissibly charges multiple conspiracies. They rely on *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which prohibits conviction of multiple conspiracies under an indictment charging a single conspiracy.

Their reliance is misplaced. *Kotteakos* arose under the general conspiracy statute, 18 U.S.C. § 371, while this case is brought under RICO. A RICO conspiracy is substantially broader than an ordinary § 371 conspiracy. *United States v. Riccobene,* 709 F.2d 214, 224–25 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *United States v. Sutherland,* 656 F.2d 1181, 1189–95 (5th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); *United States v. Sutton,* 642 F.2d 1001, 1017 (6th Cir.1980) (en banc), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981); *United States v. Elliott,* 571 F.2d 880, 902–03 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

In *United States v. Ruggiero,* 726 F.2d 913 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), the racketeering conspiracy alleged consisted of an agreement to operate the Bonnano crime family through a pattern of racketeering activity that "consisted of 13 separate conspiracies to violate various state and federal laws involving the defendants in various combinations." *Id.* at 915. The Second Circuit rejected the defendants' claim that this constituted multiple conspiracies:

> Nor does a RICO conspiracy under 18 U.S.C. § 1962(d), supported by predicate acts of racketeering activity that in themselves are conspiracies, violate the prohibition of *Kotteakos v. United States,* [328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)], which prohibits conviction of multiple conspiracies under an indictment charging a single conspiracy. *United States v. Elliott,* 571 F.2d at 900–902. A RICO conspiracy under § 1962(d) based on separate conspiracies as predicate offenses is not merely a 'conspiracy to conspire' as alleged by appellants, but is an overall conspiracy to violate a substantive provision of RICO, in this case § 1962(c), which makes it unlawful for any person associated with an interstate enterprise to 'participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.' *See, United States v. Zemek,* 634 F.2d 1159, 1170 n. 15 (9th Cir.1980), *cert. denied,* [450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981)].

726 F.2d at 923.

*Ruggiero* demonstrates that a RICO conspiracy is broader than a conspiracy to commit a particular crime. *See also United States v. Barton,* 647 F.2d 224, 236–38 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). *Ruggiero* also demonstrates that the fact that different persons agree, as part of the conspiracy, to commit different crimes, does not convert the single agreement to conduct the affairs of an enterprise through a pattern of racketeering activity into multiple conspiracies.

The indictment is, on its face, valid. It alleges one conspiracy to commit one crime—conducting the affairs of an enterprise through a pattern of racketeering activity. Moreover, the indictment charges the existence of a single enterprise—the Colombo Family of La Cosa Nostra. Such an organized crime family is the prototype of the kind of enterprise the RICO statute

was intended to cover. *United States v. Bledsoe,* 674 F.2d 647, 664–65 (8th Cir.), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982); *Napolitano,* 564 F.Supp. at 953–54.

In any event, the issue of multiple conspiracies cannot be resolved at this pretrial stage. Rather, the Second Circuit has repeatedly made clear that whether there is a single or multiple conspiracies is a "question of fact for a properly instructed jury," *e.g., United States v. Alessi,* 638 F.2d 466, 472 (2d Cir.1980), and is "singularly well-suited to resolution by the jury." *United States v. Potamitis,* 739 F.2d 784, 787 (2d Cir.) (*quoting United States v. McGrath,* 613 F.2d 361, 367 (2d Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980)), *cert. denied,* 105 S.Ct. 297 (1984). If the government fails to establish the existence of the single conspiracy charged in the indictment, defendants may raise the issue at the close of the government's case or request a jury instruction on multiple conspiracies. There is no basis, however, for the challenge to the properly pleaded indictment at this time.

Accordingly, defendants' motion to dismiss the indictment as duplicitous is denied.

### C. *Venue*

Defendants Langella, DiBella, Alphonse Persico, Scarpati and McIntosh move this Court for an order changing venue from the Southern District of New York to the Eastern District. They ground their motion on the mandatory provisions of F.R. Cr.P. 18 and the discretionary provisions of F.R.Cr.P. 21(b). For the reasons stated below, the motion is denied.

#### 1. *Improper Venue—Rule 18*

 The Constitution, in both the sixth amendment and article III, section 2, provides that a defendant must be tried in the state and district where the crime was committed. F.R.Cr.P. 18 requires that "the prosecution shall be had in a district in which the offense was committed." The

propriety of venue depends on "whether *any part* of the crime was committed within the district." *United States v. Panebianco,* 543 F.2d 447, 455 (2d Cir.1976) (emphasis added), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977); *see United States v. Silvestri,* 719 F.2d 577, 582 (2d Cir.1983); *United States v. Busic,* 549 F.2d 252, 258 (2d Cir.1977).[2] When Congress makes no specific provision for venue, as with the crimes charged against the moving defendants, venue depends on "the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cores,* 356 U.S. 405, 408, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958) (*quoting United States v. Anderson,* 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946)); *accord United States v. Chestnut,* 533 F.2d 40, 46 (2d Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). In the case of "continuing offenses," such as the crimes charged in the indictment, *see* 18 U.S.C. § 3237, "the locality of [the] crime shall extend over the whole area through which force propelled by an offender operates." *United States v. Johnson,* 323 U.S. 273, 275, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944); *accord Busic,* 549 F.2d at 259 (offense may be tried "wherever it was 'begun, continued or completed'" and "wherever sufficient purposeful acts occurred"); *United States v. Gilboe,* 684 F.2d 235, 239 (2d Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983); *United States v. Candella,* 487 F.2d 1223, 1227–28 (2d Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974).

 With respect to the conspiracy charges, the government need only prove the occurrence of overt acts by one or more of the co-conspirators in furtherance of the conspiracy in the Southern District of New York. *E.g., Hyde v. United States,* 225 U.S. 347, 367, 32 S.Ct. 793, 802, 56 L.Ed. 1114 (1912); *United States v. Valle,* 16

---

**2.** Proper venue need only be proved by the government by a preponderance of evidence.

*Panebianco,* 543 F.2d at 455.

F.R.D. 519, 522 (S.D.N.Y.1955) (Kaufman, J.) (venue in conspiracy case proper in any district in which overt act taken, even where some conspirators never physically present in district). Similarly, a substantive RICO violation is properly venued in any district where the enterprise conducted business. *Napolitano*, 552 F.Supp. at 482; *cf. United States v. Fry*, 413 F.Supp. 1269, 1272–73 (E.D.Mich.1976) (broad venue to prosecute a continuing criminal enterprise), *aff'd*, 559 F.2d 1221 (6th Cir.1977). It is of no moment that any individual moving defendant was not in this District, *Chestnut*, 533 F.2d at 47, so long as the government establishes that the defendant participated in an enterprise that conducted illegal activities in the Southern District.

 The government claims it will prove a wide variety of connections between the operations of the Colombo Family and the Southern District. These include, but are not limited to: (i) meetings and telephone calls among the defendants and their associates in furtherance of the enterprise; (ii) all of the restaurants which were extorted; (iii) several of the construction firms which were extorted, and the job sites on which they worked; (iv) the headquarters of several of the unions through which the enterprise carried out its extortionate activities; (v) acts in furtherance of the defendants' loansharking activities; (vi) art objects valued at $700,000, later "fenced" by members of the enterprise, were stolen from an art gallery located in this District; (vii) defendant Carmine Persico was physically in this District, incarcerated in the Metropolitan Correctional Center, when he allegedly performed a number of the acts charged in the indictment; (viii) a portion of the scheme to commit bribery at the Ashland Federal Correctional Institution was carried out here; and (ix) the enterprise's gambling business was carried on, in part, here.

Accordingly, venue in the Southern District is appropriate within the meaning of Rule 18.

### 2. *Inappropriate Venue—Rule 21(b)*

 Defendants argue that even if venue is proper in the Southern District, it would be more convenient to the parties and witnesses, and in the interests of justice, to transfer this case to the Eastern District of New York. Federal Rule of Criminal Procedure 21(b) permits a Court to exercise its discretion to transfer a criminal case from one district to another "[f]or the convenience of the parties and witnesses, and in the interest of justice." The burden of setting forth facts sufficient to warrant transfer is, of course, on the moving party. *United States v. Aronoff*, 463 F.Supp. 454, 460 (S.D.N.Y.1978). The factors to be considered include the location of the defendant and of possible witnesses, counsel, documents and records and the events at issue, the expense to the parties and the relative accessibility of the place of trial. *United States v. Keuylian*, 602 F.2d 1033, 1038 (2d Cir.1979); *Aronoff*, 463 F.Supp. at 460. None of the defendants has demonstrated that transfer of the trial one mile from the Southern District Courthouse to the Eastern District Courthouse in Brooklyn serves any of the interests underlying the rule. *See Napolitano*, 552 F.Supp. at 482. It is clear that, at this point, transfer would only serve to delay the trial.

Assuming *arguendo* that Brooklyn is in fact the locus of the Colombo Family's criminal operations, this does not justify transfer of the case. When a racketeering case is properly venued in either of two adjacent districts—whose courthouses are only one mile apart—it is difficult to imagine convenience interests that would compel transfer of the case. As between the two districts, the situs of prosecution is generally a decision more properly within the province of the Attorney General than a federal district judge.

Since the prosecution has already been brought here, the grand jury which heard evidence is located here, the government's attorneys are located here, and a large number of documents and other evidence accumulated by the government to support

its charges are located here, it would be imprudent to transfer the case to Brooklyn. Accordingly, the defendants' motion to transfer the case to the Eastern District is denied.

### D. *Pitta—Counts 26–33*

Defendant Pitta asserts that the Hobbs Act and Taft-Hartley Act charges contained in Counts Twenty-Six through Thirty-Three of the indictment fail to provide sufficient notice of the charges against him. It is settled law "that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). Applying this test, the Second Circuit "has 'consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms.'" *United States v. Trotta*, 525 F.2d 1096, 1099 (2d Cir.1975) (*quoting United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir.1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974) ), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

■ Defendant Pitta's assertions notwithstanding, Hobbs Act and Taft-Hartley Act counts need not allege with exactitude the dates on which money was demanded, *United States v. Dierker*, 164 F.Supp. 304, 305 (W.D.Pa.1958), the location where the extortions took place, *see e.g., Trotta*, 525 F.2d at 1097 n. 1, 1099; *United States v. Palmiotti*, 254 F.2d 491, 494–95 (2d Cir. 1958); the amounts of money obtained, *see e.g., United States v. Addonizio*, 451 F.2d 49, 60 (3d Cir.1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 31 L.Ed.2d 591 (1972); *United States v. Holt*, 333 F.2d 455, 457 (2d Cir.1964), *cert. denied*, 380 U.S. 942, 85 S.Ct. 1020, 13 L.Ed.2d 961 (1965); or the names of the individuals who made payments on behalf of the victim business, *see United States v. McMaster*, 343 F.2d 176,

181 (6th Cir.), *cert. denied*, 382 U.S. 818, 86 S.Ct. 42, 15 L.Ed.2d 65 (1965); *see, e.g., United States v. Craig*, 573 F.2d 513, 517–18 (7th Cir.) (indictment charged extortion of "the registered lobbyist, officers, members of and companies belonging to the Illinois Car and Truck Renting and Leasing Association"), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978); *Trotta*, 525 F.2d at 1097 n. 1, 1099 (indictment charged extortion of "William F. Cosulich Association"); *Palmiotti*, 254 F.2d at 494–95 (indictment charged extortion of "an agent and representative of Robert S. MacLean, Inc.").

■ The charges challenged in this case contain the elements of the offenses and enough additional detail to give Pitta adequate notice and protection against double jeopardy. As in *Trotta*, 525 F.2d at 1099–1100, and *Palmiotti*, 254 F.2d at 494–95, which rejected similar challenges to Hobbs Act indictments, the charges in this case allege, either in specific or approximate terms, the dates, the locations, and, with the exception of Counts 29 and 33, the amounts of the extorted payments, together with the identities of the businesses that were extorted.

Accordingly, Pitta's motion to dismiss counts 26–33 for inadequately apprising him of the charges against him is denied.

### E. *Melli—Counts 1–2*

Defendant Melli contends that Counts One and Two of the indictment, which charge substantive and conspiracy violations of the RICO statute, are multiplicitous. The standard for measuring multiplicity is the test set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two district statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

■ A RICO conspiracy requires an agreement by two or more persons to par-

ticipate in the affairs of an enterprise through a pattern of racketeering activity; a RICO substantive offense requires proof that the defendant actually participated in the affairs of the enterprise through a pattern of racketeering activity. Thus, these offenses bear the same relation to each other as any conspiracy count bears to its substantive counterpart, *Ruggiero*, 726 F.2d at 923, and such offenses are not multiplicitous. *See e.g., Iannelli v. United States,* 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975). In fact, in *United States v. Bagaric,* 706 F.2d 42, 63 n. 18 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), the Second Circuit held that RICO conspiracy and substantive violations are separate offenses that can be punished cumulatively.

Accordingly, Melli's motion to dismiss Counts One and Two as multiplicitous is denied.

### F. *Motion to Strike*

■■■■ Defendants Melli and Falanga move this Court for an order, pursuant to F.R.Cr.P. 7(d), striking references in the indictment to the use of "anti-bugging" equipment, to "organized crime" and associated terms, and to certain aliases. A motion to strike under Rule 7(d) will not be granted unless "it is clear that the allegation complained of is not relevant to the charge contained in the indictment and is inflammatory and prejudicial." *United States v. Klein,* 124 F.Supp. 476, 479–80 (S.D.N.Y.1954), *aff'd,* 247 F.2d 908 (2d Cir. 1957), *cert. denied,* 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958). An indictment may properly include any allegation that is "relevant to the case and will constitute part of the government's proof at trial." *United States v. Esposito,* 423 F.Supp. 908, 911 (S.D.N.Y.1976) (Weinfeld, J.); *accord United States v. DePalma,* 461 F.Supp. 778, 797 (S.D.N.Y.1978) ("If the allegation is of matters by which the Government will prove the charge, then such allegations can scarcely be called 'surplusage.' "); *see Napolitano,* 552 F.Supp. at 480.

■■■■ The indictment charges that Melli participated in the conduct of an enterprise, the Colombo Family, through a pattern of racketeering activity. The government says it will prove that the enterprise was organized into different "crews" and that the roles the defendants played in the enterprise were referred to as "bosses," "capos," "soldiers," and "made members." In establishing the existence of the enterprise, and describing its operations, these terms will inevitably be part of the proof at trial. Thus, they would not be properly stricken from the indictment.

■■■■ Melli also objects to the reference in the indictment to the defendants' use of "anti-bugging" devices. An indictment may properly set forth background information relevant to a defendant's motive and intent. *United States v. Archer,* 355 F.Supp. 981, 989 (S.D.N.Y.1972), *rev'd on other grounds,* 486 F.2d 670 (2d Cir. 1973); *United States v. Climatemp, Inc.,* 482 F.Supp. 376, 391–92 (N.D.Ill.1979), *aff'd sub nom. United States v. Reliable Sheet Metal Works, Inc.,* 705 F.2d 461 (7th Cir.), *cert. denied,* 462 U.S. 1134, 103 S.Ct. 3116, 77 L.Ed.2d 1370 (1983). These allegations are part of the description of the means by which the defendants operated the enterprise. Evidence of the use of devices to frustrate electronic surveillance is relevant to the defendants' intent and is also relevant to show their "consciousness of guilt." *Cf. United States v. Culotta,* 413 F.2d 1343, 1346 (2d Cir.1969), *cert. denied,* 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970); *United States v. Rucker,* 586 F.2d 899, 904 (2d Cir.1978); *United States v. Di Stefano,* 555 F.2d 1094, 1104 (2d Cir.1977); *United States v. Ayala,* 307 F.2d 574, 576 (2d Cir.1962). Since the evidence will be relevant at trial, it would not be properly stricken from the indictment.

Falanga moves to strike those references in the indictment to his alias: "Frankie the Beast." At oral argument, several other defendants joined the motion to strike aliases. At the outset, the Court notes that aside from the aliases of Falanga and Carmine Persico, a/k/a "The Snake," most of the listed aliases are innocuous (e.g. Hugh McIntosh, a/k/a "Apples").

■ Even if prejudicial, however, aliases and nicknames are proper in an indictment where they will be part of the government's proof at trial. *United States v. Miller,* 381 F.2d 529, 536 (2d Cir.1967), *cert. denied,* 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968); *United States v. Clark,* 541 F.2d 1016, 1018 (4th Cir.1976). In this case, the government contends that proof of nicknames is integral to its case. The government claims that in testimony and on tape there will be references to, for example, "Frankie the Beast," without mention of any surname. If no such proof is introduced, the Court will entertain a motion to strike aliases, particularly those of defendants Carmine Persico and Falanga, at the conclusion of the government's case.

■ Accordingly, defendants' motions to strike language from the indictment are denied without prejudice to their right to renew the motions subsequent to presentation of the government's case.

### G. *Title III Interceptions*

Defendants Langella, Scopo and Alphonse Persico move to suppress Title III interceptions, obtained pursuant to court order, on the grounds that: (i) there was no probable cause to support the order authorizing interception of conversations at the Casa Storta restaurant; (ii) the government failed to establish a need to conduct electronic surveillance; (iii) the authorization orders were overly broad; (iv) the tapes of intercepted conversations were not sealed in timely fashion; and (v) as to Scopo, that since he was not named in the Title III orders, the authorized tapes should be suppressed. For the reasons stated below, the motion is denied.

### 1. *Probable Cause*

Scopo argues that there was no probable cause to intercept conversations at a restaurant in Brooklyn known as the Casa Storta, a meeting place allegedly used by Langella, Montemarano, and other members of the Colombo Family to discuss enterprise activities. Scopo contends that the federal agent's affidavit supporting the intercept order is insufficient to establish probable cause for the interceptions because the affidavit does not describe any "specific" criminal conversations that took place at the Casa Storta restaurant.

■ The standard for probable cause necessary to secure an intercept order is precisely the same as that required for a regular search warrant. *United States v. Fury,* 554 F.2d 522, 530 (2d Cir.), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); *United States v. Londano,* 553 F.2d 805, 810 (2d Cir.1977). Probable cause to issue an intercept order exists when the facts made known to the issuing magistrate are "sufficient to warrant a prudent man in believing" that evidence of a crime could be obtained through the use of electronic surveillance. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); 18 U.S.C. § 2518(3). The Second Circuit has explained probable cause as follows:

> The essence of probable cause is a reasonable, objective basis for *belief* in a suspect's guilt, although *not necessarily proof* of guilt beyond a reasonable doubt.... [P]robable cause ... is not limited to those instances where the ... officer has acquired evidence which would be sufficient to convict the suspect at trial.... Similarly, facts ostensibly sufficient to establish probable cause ... are not negated simply because such facts also may be consistent with the suspect's innocence.

*United States v. Webb,* 623 F.2d 758, 761 (2d Cir.1980) (emphasis in original). Judge Weinfeld recently described the probable cause standard under 18 U.S.C. § 2518 in the following terms:

> In determining probable cause under this statute the same standard is applied as in determining whether probable cause exists to issue search or arrest warrants. The standard in reviewing a previous determination of probable cause for the issuance of a warrant by a judicial officer is "only a probability, and not a prima facie showing of criminal activity."

*United States v. Shipp*, 578 F.Supp. 980, 985 (S.D.N.Y.1984) (footnote omitted) (*quoting United States v. Travisano*, 724 F.2d 341, 345–46 (2d Cir.1983)) *aff'd*, 754 F.2d 1427 (2d Cir.1985). In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court stated that probable cause "means less than evidence which would justify condemnation" and is far more comparable to evidence "which warrant[s] suspicion." *Id.* at 235, 103 S.Ct. 2317 (citations omitted).

As with search warrants, intercept orders have a presumption of validity. *Fury*, 554 F.2d at 530; *Londano*, 553 F.2d at 810. In considering whether the issuing court acted properly and based its decision on probable cause, substantial deference must be given to the prior judicial determination. *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *Londano*, 553 F.2d at 810; *United States v. DePalma*, 461 F.Supp. 800, 807 (S.D.N.Y.1978). The affidavit supporting the application for an intercept order must be read as a whole, and tested in a realistic, commonsense fashion. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332; *e.g., United States v. Harris*, 403 U.S. 573, 577, 91 S.Ct. 2075, 2078, 29 L.Ed.2d 723 (1971); *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965); *United States v. Kahan*, 572 F.2d 923, 29 (2d Cir.), *cert. denied*, 439 U.S. 833, 99 S.Ct. 112, 58 L.Ed.2d 128 (1978). In *Gates*, the Supreme Court reminded the lower courts that "technical requirements of elaborate specificity ... have no proper place in this area." 462 U.S. at 235, 103 S.Ct. at 2330 (*quoting United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965)); *see Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983).

The interceptions in this case were conducted pursuant to a Court order initially signed by United States District Judge I. Leo Glasser of the Eastern District of New York on December 10, 1982. This order was issued based upon information set forth in an affidavit of Special Agent John P. Joyce of the Federal Bureau of Investigation. A review of Agent Joyce's affidavit compels this Court to agree with Judge Glasser's finding that there was probable cause to believe that Langella, Montemarano, and other members of the Colombo Family were engaged in criminal activity and that interceptions of conversations at the Casa Storta restaurant would yield evidence of that activity.

Agent Joyce's affidavit recounts reliable information from several sources as to the nature of the criminal enterprise in this case. The affidavit describes the Colombo Family's involvement in crimes such as loansharking, gambling, and labor racketeering. Agent Joyce's affidavit describes the roles of various persons in the Colombo Family. The involvement pertains to the defendant Persico and several of his relatives, and to the defendant Langella, Montemarano, Scopo, and others. For example, the affidavit specifically describes Scopo's involvement in labor racketeering and beatings.

The affidavit states that at least four different reliable sources have provided information that Langella, Montemarano, Melli, DeRoss, and other members of the Colombo Family regularly meet at the Casa Storta restaurant. Contrary to Scopo's assertion, the Joyce affidavit states that these various sources indicated that the Colombo Family members regularly meet at Casa Storta for the specific purpose of discussing the business of their criminal enterprise. (Paragraphs 73–79A). The affidavit specifically describes this business as including loansharking, gambling, and labor racketeering. (Paragraph 77). The affidavit also sets forth detailed information that while Montemarano had been very sensitive to government surveillance, he apparently viewed Casa Storta as a safe place where he could freely discuss Colombo Family business. (Paragraph 79A).

Agent Joyce's affidavit also describes physical surveillance that confirmed that Langella, Montemarano, and other Colombo Family members did in fact meet on a regular basis at Casa Storta. The circum-

stances of those meetings, as described in Agent Joyce's affidavit, support the conclusion that Colombo Family business was discussed at those restaurant meetings. For example, on one occasion, in August 1982, Langella, Montemarano and others were observed meeting at Casa Storta. Throughout the meeting, the waiter was given signals to stay away from the table during parts of the conversation. (Paragraph 84). Given the evidence, recounted in the affidavit, of Langella's and Montemarano's important roles in the Colombo Family's illegal operation, it was reasonable to conclude that illicit activities were being discussed at the meeting. On another occasion, in September 1982, Montemarano and Langella made arrangements to meet at Casa Storta. After meeting at Casa Storta for almost two hours, Langella and Montemarano were observed leaving Casa Storta and going to another meeting in Little Italy in Manhattan. There, Langella and Montemarano met with Aniello Dellacroce, alleged underboss of the Gambino Family of La Cosa Nostra. (Paragraph 23).

Agent Joyce's affidavit also describes how telephone records further confirmed the information that Casa Storta was used as a meeting place to discuss Colombo Family business. The affidavit describes numerous phone calls made to Langella and Montemarano at the restaurant. The affidavit also describes how numerous calls were made from the Persico residences to the restaurant. Phone calls were also made to the restaurant from the Federal prison in Danbury, Connecticut, where Colombo Family boss Carmine Persico was then incarcerated. Given the substantial evidence in the affidavit of Persico's role as boss of the Colombo Family, and given the physical evidence that Langella, Montemarano, and other Colombo Family members regularly met at Casa Storta, Scopo's argument that there was no reasonable grounds to believe that Colombo Family business was being discussed at the restaurant is unpersuasive.

The Joyce affidavit plainly sets forth a "sufficiently suspicious set of overlapping facts," *United States v. Manafzadeh,* 592 F.2d 81, 90 (2d Cir.1979), to warrant a finding of probable cause. This is particularly so given the direct, specific evidence from several sources, as reported in the affidavit, that illegal activities were regularly discussed in the restaurant. Given the Supreme Court's direction to eschew "technical requirements of elaborate specificity" as a part of the probable cause finding, *Gates,* 462 U.S. at 235, 103 S.Ct. at 2330, it would be improper to disturb Judge Glasser's finding that there was probable cause to believe that electronic surveillance at Casa Storta restaurant would yield evidence of specified crimes.

### 2. *Need for Electronic Surveillance*

Defendants Scopo and Langella claim that the government failed to establish any need to conduct electronic surveillance. Title 18 U.S.C. § 2518(3)(c) requires, as a precondition to authorization of an interception, that the government show that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." In construing this requirement in a "common sense and realistic fashion," *United States v. Ruggiero,* 726 F.2d 913, 924 (2d Cir.1984) (*quoting United States v. Ivic,* 700 F.2d 51, 57 (2d Cir.1983)), *cert. denied,* — U.S. —, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984); *accord United States v. Lilla,* 699 F.2d 99, 102–03 (2d Cir.1983), the Second Circuit has required that the government's supporting affidavit "provide some basis for concluding that less intrusive investigative procedures are not feasible," *Lilla,* 699 F.2d at 103. The Second Circuit has stated that:

[T]he purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

*United States v. Vazquez,* 605 F.2d 1269, 1282 (2d Cir.) (*quoting United States v. Hinton,* 543 F.2d 1002, 1011 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976) ), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *see also United States v. Terry,* 702 F.2d 299, 309–10 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Todisco,* 667 F.2d 255, 258–59 (2d Cir.1981), *cert. denied,* 455 U.S. 906, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *Fury,* 554 F.2d at 530; *United States v. Steinberg,* 525 F.2d 1126, 1130 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Hyde,* 574 F.2d 856 (5th Cir.1978).

When a major criminal conspiracy has proved difficult to infiltrate or otherwise expose by ordinary law enforcement techniques, the necessity requirement of § 2518(3)(c) is generally met. *E.g., United States v. Wilkinson,* 754 F.2d 1427, 1433–34 (2d Cir.), *cert. denied sub nom. Shipp v. United States,* —— U.S. ——, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *Ruggiero,* 726 F.2d at 924; *see United States v. Schwartz,* 535 F.2d 160, 163 (2d Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581 (1977); *Steinberg,* 525 F.2d at 1130. In *Wilkinson,* the Second Circuit ruled:

> Nor do we find any merit in Mac's contention that the wiretap orders issued by Judge Edelstein and Judge Carter were defective for failure to show, as required by 18 U.S.C. § 2518(1)(c), that other investigative procedures had been tried and failed or would be unlikely to succeed or be too dangerous. We find no reason to disturb Judge Weinfeld's opinion on the subject, 578 F.Supp. 980 (S.D.N.Y.1984), which is entitled to deference, *United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). After thoroughly investigating the feasibility of alternatives, he found that (1) surveillance had been, and would likely continue to be, ineffective; (2) infiltration was unlikely to be successful because of the secretive nature of the

enterprise; (3) concerns about the safety of the agents had arisen; (4) reliance on a search warrant would be premature; and (5) to subpoena Ella Shipp would be worthless, since she was unlikely to testify against her co-conspirators even if she were granted immunity. His reasoned explanation, grounded in the facts of the case, "square[s] with common sense." *United States v. Lilla,* 699 F.2d 99, 105 (2d Cir.1983). This was no "small time narcotics case" of the type faced in *Lilla,* where simple investigative techniques might have sufficed, but a far-flung conspiracy that was impenetrable except by sophisticated electronic means.

*Id.* (parallel citations omitted).

The instant case is similar. It is not a "small time" criminal conspiracy; it is allegedly one of the major organized criminal enterprises in the country. The Court notes:

1. The members of the organization were highly resistent to ordinary surveillance techniques. Montemarano, for example, changed his automobile to frustrate government surveillance. (Paragraph 79).

2. The confidential sources that have provided the government with information about the Colombo Family are unwilling to testify and, in any event, have had limited direct access to the higher echelons of the Family. Thus, use of undercover agents and consent recordings were not viable substitutes for electronic surveillance.

3. Concern for the safety of agents is self-evident in attempting to infiltrate an organization that allegedly uses "threats, beatings, and murder" in the normal course of conducting business. (Indictment ¶ 2c.)

4. The information the government had about the Colombo Family was not such as to make the use of search warrants fruitful.

5. The nature of the enterprise and the character of its members also pre-

cluded a grand jury investigation until all of the persons associated with the Colombo Family were identified.

■ Accordingly, viewing the record in a realistic fashion, the Court concludes that the government established the need for electronic surveillance in this case.

### 3. *Scope of Authorization Orders*

■ Scopo challenges the Court orders authorizing the electronic surveillance as being overly broad. Such, he argues, is the result of the allowance of surveillance of unidentified accomplices of the Colombo Family members identified in the government's application. The Court disagrees.

The Second Circuit, in the recent case of *United States v. Figueroa*, 757 F.2d 466 (2d Cir.1985), rejected the claim that a Title III order was overly broad because it permitted the surveillance of "others as yet unknown" who were involved in the commission of crimes with the persons named in the Title III order. The Court's reasoning was révealing, as regards the merits of the instant motion:

> Title III provides comprehensive procedures for authorizing electronic surveillance, for proper monitoring by law enforcement officials, and for ongoing judicial supervision of the authorized surveillance. Section 2518(1) details the information required to be set forth in a wiretap application. Section 2518(1)(b)(iv) calls for "the identity of the person, *if known*, committing the offense and whose communications are to be intercepted." (Emphasis added). Similarly, under § 2518(4)(a) the order authorizing the interception must specify "the identity of the person, *if known*, whose communications are to be intercepted." (Emphasis added). The language of both sections, therefore, anticipates interception of calls of people whose identities are not known at the time of the application and order. "The clear implication of this language is that when there is probable cause to believe that a particular telephone is being used to commit an offense but no particular person is identi-

fiable, a wire interception order may, nevertheless, properly issue under the statute." *United States v. Kahn*, 415 U.S. 143, 157, 94 S.Ct. 977, 985, 39 L.Ed.2d 225 (1974). Innocent parties are protected from unreasonable surveillance by the requirement contained in § 2518(5) that surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception * * *." *See Scott v. United States*, 436 U.S. 128, 130–31, 98 S.Ct. 1717, 1719–20, 56 L.Ed.2d 168 (1978).

*Id.* 757 F.2d at 470 (parallel citations omitted). In view of *Figueroa*, Scopo's claim of overbreadth is denied.

### 4. *Timeliness of Tape Sealing*

■ Scopo argues that the government failed to seal the tapes in a timely fashion. Under 18 U.S.C. § 2518(8)(a), recordings made pursuant to authorization of electronic surveillance are admissible as evidence as long as they were sealed at the conclusion of one continuous period of surveillance, including all extensions of the original order. *Vazquez*, 605 F.2d at 1276; *United States v. Sotomayor*, 592 F.2d 1219, 1225–26 (2d Cir.), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 268 (1979). Where the interception is of the same premises, substantially the same persons, and for the same purpose, there is only one period of electronic surveillance "regardless of the number or length of judicial orders that have been issued to authorize that surveillance." *Vazquez*, 605 F.2d at 1276; *accord United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir.1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978); *Fury*, 554 F.2d at 533.

■ Scopo concedes that there was one continuous period of interception and that the government was not required by law to seal the tapes until the end of that period. Nevertheless, Scopo contends that since the government followed the more prudent course of sealing the tapes in approximately thirty-day intervals, the government assumed an obligation to seal all the tapes in

thirty-day intervals. Such an obligation would likely discourage the government from periodic sealing during the course of a lengthy investigation, a practice that is designed to insure the privacy of targets and subjects. Therefore, this Court declines to compel the government to assume such an obligation.

Even if Scopo were correct that the government was required to seal the tapes at thirty-day intervals, delays of three or four days in sealing the tapes are excusable. Short delays of this kind have rarely compelled suppression. *See, e.g., United States v. McGrath*, 622 F.2d 36, 43 (2d Cir.1980) (eight day delay excused where there was no evidence of prejudice to defendant or foul play); *Vazquez*, 605 F.2d at 1279 (seven to thirteen day delays excused where no bad faith on part of the government was found); *Scafidi*, 564 F.2d at 641 (seven day delay excused since it was not the result of any attempt to avoid sealing requirement or gain a tactical advantage); *Fury*, 554 F.2d at 533 (six days excused); *United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.) (thirteen days excused), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); *see also United States v. Diana*, 605 F.2d 1307, 1315–16 (4th Cir. 1979) (delay of thirty-nine days did not require suppression), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); *United States v. Angelini*, 565 F.2d 469, 472–73 (7th Cir.1977) (delays of nine to twenty-six days in sealing did not require suppression), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978); *United States v. Lilla*, 534 F.Supp. 1247 (N.D.N.Y. 1982) (delay of sixteen days in sealing did not require suppression), *rev'd on other grounds*, 699 F.2d 99 (2d Cir.1983).

Accordingly, Scopo's claim that tapes of intercepted conversations were not sealed in timely fashion is without merit.

### 5. *Scopo—Insufficient Specificity of Order*

■ Scopo contends that the government failed to name him early enough in any of the orders authorizing the Title III interceptions and therefore, conversations intercepted pursuant to the order should be suppressed. The Supreme Court, however, has made it clear that this does not warrant suppression of the tapes. In *United States v. Donovan*, 429 U.S. 413, 437 n. 25, 97 S.Ct. 658, 673 n. 25, 50 L.Ed.2d 652 (1977), the Supreme Court stated:

> Even if we assume that Congress thought that a broad identification requirement was constitutionally mandated, it does not follow that Congress imposed statutory suppression under §§ 2515 and 2518(10)(a)(i) as a sanction for noncompliance. In limiting use of the intercept procedure to "the most precise and discriminate circumstances," S.Rep. No. 1097, 90th Cong., 2d Sess., 102 (1968), U.S.Code Cong. & Admin. News, p. 2191, Congress required law enforcement authorities to convince a district court that probable cause existed to believe that a specific person was committing a specific offense using a specific telephone. This requirement was satisfied here when the application set forth sufficient information to indicate that the primary targets were conducting a gambling business over four particular telephones. Nothing in the legislative history indicates that Congress intended to declare an otherwise constitutional intercept order "unlawful" under § 2518(10)(a)(i)—resulting in suppression under § 2515—for failure to name additional targets.

*See Shipp*, 578 F.Supp. at 990–91. In view of *Donovan*, the Court concludes that Scopo's contention that the order was defective in failing to name him is without merit.

### H. *Melli—Motion to Suppress Evidence*

Defendant Melli moves this Court for an order suppressing physical evidence, statements and co-conspirator declarations. For the reasons stated below, his motion is denied.

### 1. *Physical Evidence*

■ Melli contends that there was no probable cause for the issuance of a warrant to search his house. The supporting affidavit for the warrant indicates otherwise. The

affidavit recounts specific information from a confidential source describing the large volume of firearms kept at Melli's home. The affidavit describes Melli's plans to sell these weapons illegally and recites specific information about Melli's possession of stolen property and about the location, in Melli's home, of records of his loansharking business. The affiant also gives specific reasons for believing the confidential source and demonstrates how information provided by the confidential source was corroborated by independent evidence. There is little doubt that this affidavit established probable cause for believing that evidence of illegal activity would be found at Melli's residence. *See Illinois v. Gates*, 462 U.S. 213, 233–35, 103 S.Ct. 2317, 2328–30, 76 L.Ed.2d 527 (1983).

In any event, Melli must show not only that the warrant was defective, but that the agents could not reasonably have relied on the warrant in conducting the search. *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 3419, 82 L.Ed.2d 677 (1984); *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir.1985). Far from making a showing that would support such a finding, Melli has not even made an allegation to that effect.

Accordingly, Melli's motion to suppress physical evidence seized from his home, pursuant to a facially valid search warrant, is denied.

### 2. *Statements*

Melli also seeks to suppress statements. Yet, he fails to identify the statements to which he is referring. Absent some more information on exactly what he seeks to suppress, the government cannot fairly respond and the Court does not know what to consider. Denied.

### 3. *Co-Conspirator Declarations*

Melli contends that the Court should exclude co-conspirator declarations unless it holds a *"James* hearing" in this case. At such a pretrial hearing, according to Melli, the government would be required to establish the existence of a conspiracy and its membership before co-conspirator declarations could be received at trial. Fed.R.

Evid. 801(d)(2)(E); *see United States v. James*, 576 F.2d 1121, 1127–32 (5th Cir. 1978), *modified en banc*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). In *United States v. Wilson*, 565 F.Supp. 1416 (S.D.N.Y.1983)), *aff'd*, 750 F.2d 7 (2d Cir.1984), Judge Weinfeld denied defendants' motion for a *"James* hearing" with a statement of the law in this Circuit:

> Under *United States v. James*, the Fifth Circuit requires a pretrial hearing before hearsay statements of co-conspirators may be received as against one another. In our Circuit, however, the matter is admissible upon the trial court's determination, made at the close of the government's case, of the sufficiency of the evidence, independent of the hearsay testimony, that the alleged co-conspirator participated in the conspiracy.

The Second Circuit has stated that "[t]he law is well-settled that declarations that are otherwise hearsay may nonetheless be provisionally admitted pursuant to Rule 801(d)(2)(E)...." *United States v. Margiotta*, 688 F.2d 108, 136 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *see e.g., United States v. Mastropieri*, 685 F.2d 776, 786–90 (2d Cir.), *cert. denied*, 459 U.S. 945, 103 S.Ct. 260, 74 L.Ed.2d 203 (1982); *United States v. Cambindo-Valencia*, 609 F.2d 603, 630 (2d Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). There is no reason to depart from the Second Circuit's clear rule permitting such statements to be admitted "subject to connection" during the course of trial.

■ Accordingly, Melli's request for a *James* hearing as a precondition to admission of co-conspirator declarations is denied.

### I. *Scarpati—Return of Seized Money*

■ Scarpati seeks the return of $3,000 seized at the time of his arrest. Scarpati, however, makes no claim the money was seized illegally. The government may use this money as evidence at trial, probative of

Scarpati's participation in the criminal enterprise charged in the indictment. *See e.g., United States v. Saint Prix,* 672 F.2d 1077, 1084 (2d Cir.1982); *United States v. Barnes,* 604 F.2d 121 (2d Cir.1979); *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Therefore, Scarpati is not, at this time at least, entitled to the return of the money.

## J. *Bill of Particulars & Discovery*

Defendants Carmine Persico, Langella, DeRoss, Melli, Scarpati, Russo, Falanga, Pitta and McIntosh seek a bill of particulars and advance certain discovery demands. For the reasons stated below, their requests are denied.

### 1. *Bill of Particulars and Discovery Generally*

 The proper scope and function of a bill of particulars is to furnish facts supplemental to those contained in the indictment. Facts need not be provided unless they are necessary to apprise the defendant of the charges against him with sufficient precision so as: (i) to enable him to prepare his defense; (ii) to avoid unfair surprise at trial; and (iii) to preclude a second prosecution for the same offense. *Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927); *United States v. Salazar,* 485 F.2d 1272, 1278 (2d Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). It has been said: "Discovery in criminal proceedings is not comparable to discovery in civil because of the nature of the issues, the danger of intimidation of witnesses, and the greater danger of perjury and subornation of perjury." *United States v. Malinsky,* 19 F.R.D. 426, 428 (S.D.N.Y.1956). Thus, courts have refused to treat a bill of particulars as a general investigative tool for the defense, *United States v. Salazar,* 485 F.2d 1272 (2d Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974), or as a device to compel disclosure of the government's evidence prior to trial, *see e.g., United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir.1974); *United States v. Lebron,* 222 F.2d 531, 535–36 (2d Cir.),

*cert. denied,* 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955). Nor is the bill of particulars available to compel a preview of the government's legal theory, *see e.g., United States v. Shoher,* 555 F.Supp. 346, 350 (S.D.N.Y.1983); *United States v. Mannino,* 480 F.Supp. 1182, 1185 (S.D.N.Y.1979), or its proof at trial, *Malinsky,* 19 F.R.D. at 428.

 Several of the defendants seek specification, beyond that provided in the indictment, of the particular acts each is alleged to have participated in, had knowledge of, or for which he is being held responsible. They are not entitled to know, however, the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the government intends to adduce to prove their criminal acts. *See Shoher,* 555 F.Supp. at 350; *United States v. Politi,* 334 F.Supp. 1318, 1321 (S.D.N.Y.1971), *aff'd,* 516 F.2d 897 (2d Cir.), *cert. denied,* 423 U.S. 801, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial. *United States v. Lavin,* 504 F.Supp. 1356, 1362 (N.D.Ill.1981) (RICO case); *United States v. Angello,* 367 F.Supp. 444, 450–51 (E.D.N.Y.1973); *United States v. Iannelli,* 53 F.R.D. 482, 483 (S.D.N.Y.1971) (*citing United States v. Wolfson,* 289 F.Supp. 903, 912–14 (S.D.N.Y.), *aff'd,* 405 F.2d 779 (2d Cir.1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969) ).

The government has already revealed a substantial amount of its evidence in this case. Indeed, the Court has heard complaints that the tape recorded conversations provided to the defendants have been too voluminous to permit careful review. The government has also supplied copies of applications for intercept orders and search warrants, transcripts of numerous tapes, a list of unindicted co-conspirators and some bills of particulars. In considering defendants' requests for further discovery, the Court is also cognizant of the danger to

witnesses that could result from granting defendants' requests.

■ The Court concludes that the facts provided to the defendants through the indictment and the discovery that has occurred are sufficient to enable them to prepare their defense, avoid unfair surprise at trial and preclude a second prosecution for the same offense. Given this, and the danger to witnesses that could result from further discovery, defendants' requests for a bill of particulars and further discovery is denied.

### 2. *Pitta's* Brady *Request*

During the March 1, 1985, pre-trial conference, before Judge Brieant, Pitta made an oral motion under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), for disclosure of the grand jury testimony of Anthony Cece and seven other witnesses who he claims have given exculpatory testimony before the grand jury. That motion was a follow-up to a February 26, 1985 letter to the Court from Edward M. Shaw, Pitta's counsel. Both in the letter and during the hearing, Mr. Shaw disclosed that he had interviewed Cece and the other witnesses and had gained information that he deemed to be exculpatory. (*See* transcript of March 1, 1985 hearing (hereinafter Tr.) at pp. 111–112). Mr. Shaw recounted in detail what Cece had told him that he had testified to in the grand jury. Specifically, Mr. Shaw stated that Cece had testified that he had told various restauranteurs he was passing the payoffs to Pitta when in fact he had never done so. (Tr. 111). Mr. Shaw went on to recount that the other restauranteurs that he had interviewed told him that they never paid Pitta directly but only gave the money to Cece. (Tr. 112). Judge Brieant preliminarily ruled that *Brady* required the government to turn over Cece's testimony if the government's theory was that Cece was a conduit of payoffs to Pitta, (Tr. 113–14), yet Judge Brieant allowed the government to submit a responsive brief.

The Jencks Act, 18 U.S.C. § 3500, forbids compelled discovery of any statement or testimony of a grand jury witness prior to the time of the witness's testimony. *United States v. Sebastian,* 497 F.2d 1267 (2d Cir.1974); *United States v. Percevault,* 490 F.2d 126 (2d Cir.1974). In *Percevault,* the Second Circuit ruled that the District Court is without jurisdiction to order the pre-trial disclosure of statements of prospective government witnesses. *Id.* at 132.

F.R.Cr.P. 6(e) is also implicated by any request for disclosure of grand jury minutes. Rule 6(e) guarantees grand jury secrecy which exists to protect the integrity of the criminal justice process. *See In re Grand Jury Investigation of Cuisinarts, Inc.,* 665 F.2d 24, 32–33 (2d Cir.1981), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). Grand jury secrecy is intended to preserve the physical safety of the witnesses, *Id.* at 32; *see Percevault,* 490 F.2d at 131, which could be jeopardized by disclosure in this case of alleged organized crime. (*Ex Parte* Affidavit of FBI Special Agent Dietrich Volk). There is also the risk that witnesses will be intimidated. Moreover, the disclosure of this testimony will permit the defendants to tailor their testimony or that of other witnesses to meet the testimony of those who testified.

■ Defendant Pitta argues that, notwithstanding the Jencks Act and Rule 6(e), he is entitled to disclosure of the requested grand jury testimony under *Brady v. Maryland. Brady* forbids the suppression of exculpatory evidence by the prosecution. *United States v. Natale,* 526 F.2d 1160, 1170 (2d Cir.), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1975). *Brady* does not apply once, as here, a defendant knows of the "essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). In *LeRoy,* the Second Circuit carefully defined "suppression" and restricted the scope of the government's obligation under *Brady* as follows:

> Evidence is not "suppressed" if the defendant either knew, *see, e.g. United States v. Robinson,* 560 F.2d 507, 518 (2d

Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978), or should have known, *see, e.g., United States v. Brown,* 582 F.2d 197, 200 (2d Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978), of the essential facts permitting him to take advantage of any exculpatory evidence. As a result, the Government is not required to disclose grand jury testimony to a defendant who is "on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." *United States v. Stewart,* 513 F.2d 957, 600 (2d Cir.1975).

687 F.2d at 618; *see Natale,* 526 F.2d at 1170–71.

■ *Brady* is not to be utilized as a discovery device to "supply a defendant with all evidence in the government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the government." *Id.* at 619; *see United States v. Beasley,* 576 F.2d 626, 630 (5th Cir.1978) ("*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.") (citing *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976)), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *Ruggiero,* 472 F.2d at 604; *United States v. Shakur,* 543 F.Supp. 1059, 1061 (S.D.N.Y.1982) (Weinfeld, J.) ("*Brady* does not entitle a defendant to a general right of pre-trial discovery.).

Pitta has access to the witnesses and actual knowledge of that portion of their testimony which he believes is exculpatory. Obviously, the witnesses are available and accessible so that Pitta can "take advantage" of any exculpatory evidence. Pitta, of course, is free to subpoena each of these witnesses for testimony at trial. Under *Leroy* and *Natale,* the government has no

further *Brady* obligation to Pitta regarding these witnesses. To impose such an obligation would unduly transform *Brady* into a discovery device.

■ Given the scope of the government's *Brady* responsibilities in the Second Circuit, with respect to pretrial disclosure of grand jury testimony, and the policies underlying the Jencks Act and Rule 6(e), defendant Pitta's request for disclosure of grand jury minutes must be denied. Defendant Pitta, at this point, is in possession of all the information to which he is entitled.[3] Thus, his motion for pretrial disclosure is denied.

## K. *Prosecutorial Misconduct*

Defendants Carmine Persico and McIntosh move to dismiss the indictment for "interference with [Persico's] right to call witnesses." They claim that the government decided to indict the defendant McIntosh because it learned that Persico was going to call him as a witness. They rely on the fact that Persico asked for McIntosh to be brought to New York to be interviewed at a time before the superseding indictment was returned. The government contends that McIntosh was indicted because, as Persico states, "[McIntosh] participated in what now forms [sic] Racketeering Acts # 36, 37, 38, 39 and 40." (Lopez Affidavit, dated May 14, 1985, at 8). Andrew Russo was also indicted on these racketeering acts in the superseding indictment.

■ The "mere allegation of government misconduct [is] wholly insufficient to require the District Court to hold an evidentiary hearing." *United States v. Gilbert,* 668 F.2d 94, 96–97 (2d Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); *accord United States v. Persico,* 425 F.2d 1375, 1379 n. 5 (2d Cir.), *cert. denied,* 421 U.S. 950 (1975); *see*

---

**3.** In addressing the possible conflict between *Brady* and the Jencks Act, courts have routinely held that the prosecutor's compliance with the Jencks Act at trial provides timely disclosure under *Brady. See United States v. Campagnuo-* lo, 592 F.2d 852, 859–860 (5th Cir.1979); *United States v. Scott,* 524 F.2d 465, 467 (5th Cir.1975). Under the Jencks Act, defendants will be entitled to production of grand jury testimony of all the government's witnesses at trial.

*Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). Here, as in *Gilbert,* the government denies the misconduct charged, and no facts making the charge more likely than not exist. The motion is denied.

## L. *Judgment and Commitment Orders and Transcripts of Plea Proceedings*

Defendants Carmine Persico, Russo and McIntosh seek to preclude the government from offering at trial evidence that they pleaded guilty in the Eastern District of New York to offenses involving bribery which make up part of the pattern of racketeering with which they are charged in the instant indictment.[4] Persico, Russo and McIntosh were indicted in 1980 in the Eastern District on multiple counts of bribery and obstruction of justice, among other crimes, in connection with a scheme to corrupt a Special Agent of the Internal Revenue Service so as to avoid prosecution for certain crimes they had committed and to obtain other unwarranted favors from the criminal justice system. After consultation with counsel, each decided to plead guilty to the charges described above. Pursuant to their decisions to plead guilty, they appeared separately before Judge Eugene Nickerson, who fully informed them of their constitutional rights and of the significance of their actions. They acknowledged that they understood both their rights and the consequences of pleading guilty. Then, in open court, in the presence of counsel, and under oath, Persico, Russo, and McIntosh each admitted his guilt.

An admission by a defendant constitutes the strongest possible evidence of his guilt. *Wilson v. United States,* 162 U.S. 613, 622, 16 S.Ct. 895, 899, 40 L.Ed. 1090 (1896). Indeed, the Federal Rules of Evidence expressly permit the admission of hearsay "statements against interest," even where the declarant is unavailable for cross-examination, because such statements are so inherently reliable. Fed.R.Evid. 804(b)(3).

Incriminating statements by a defendant to an arresting officer, without the advice of counsel or the warnings of a judge in a courtroom, are admissible against the defendant, so long as they are voluntary and in accordance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. Where, as here, a defendant has qualified counsel, ample time for reflection, an opportunity to consider the weight of the evidence, and has been fully informed of his rights by a District Judge, his judicial admissions under oath are *a fortiori* admissible in a criminal proceeding against him. To deprive the jury of this reliable and powerful evidence would be unfair to the government and to the public.

In fact, in enacting RICO, it is clear that Congress contemplated the admission of prior convictions, obtained pursuant to plea agreements, to establish a predicate act. *See United States v. Persico,* 620 F.Supp. 836, 841–42 (S.D.N.Y.1985), *aff'd,* 774 F.2d 30 (2d Cir.1985); *United States v. Hawkins,* 658 F.2d 279, 288 (5th Cir.1981); *United States v. Aleman,* 609 F.2d 298, 306 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. DePalma,* 461 F.Supp. 778, 786–87 (S.D.N.Y.1978).

In setting forth in Rule 11 the procedures governing pleas of guilty, Congress and the Supreme Court expressly decided that in certain, limited circumstances, guilty pleas and plea allocutions would not be admissible. Rule 11(e)(6)(A) and (C) provide that only guilty pleas that later are withdrawn and plea allocutions made pursuant to guilty pleas that later are withdrawn are inadmissible against the defendant who temporarily entered the plea. The only reason that even this evidence is inadmissible is to protect the plea negotiation process by immunizing a defendant from statements he makes in the course of negotiating or entering a plea of guilty to which he ultimately does not agree. Once, as

---

**4.** The circumstances and nature of those guilty pleas are set forth in this Court's prior opinion

and order, dated July 23, 1985, addressing other pretrial motions in this case.

here, the plea is made and the judgment entered, the rule has no application.

The Court of Appeals for the Second Circuit has ruled that a prior plea of guilty to one crime was admissible against the defendant who pleaded to prove an element of a newly charged crime. *United States v. Andreadis*, 366 F.2d 423, 433 (2d Cir. 1966) (defendant's plea in state court to a charge of false advertising was admissible in a later Federal prosecution for mail fraud arising from the advertising), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); *see also Myers v. United States*, 49 F.2d 230, 231 (4th Cir.) (state court guilty plea to charge of possession of illegal liquor is admissible in subsequent federal prosecution for unlawfully selling liquor), *cert. denied*, 283 U.S. 866, 51 S.Ct. 657, 75 L.Ed. 1470 (1931). This Court will not depart from such a fair and sensible rule.

■ Accordingly, the motion of defendants Carmine Persico, Russo and McIntosh to exclude their relevant judgment and commitment orders and the transcripts of their guilty pleas from trial is denied.

### M. *McIntosh—Statute of Limitations*

Defendant McIntosh moves this Court for an order dismissing the indictment on statute of limitations grounds. The applicable statute of limitations in a RICO prosecution is found in 18 U.S.C. § 3282, the general federal limitations statute, which is five years from the time the crime is complete. *See United States v. Walsh*, 700 F.2d 846, 851 (2d Cir.), *cert. denied*, 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *United States v. Davis*, 576 F.2d 1065, 1066–67 (3d Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978).

■ In Count One of the indictment, McIntosh is charged with participating in a racketeering conspiracy under 18 U.S.C. § 1962(d). Only an agreement, not overt acts, need be proven for conviction under this subsection. *United States v. Barton*, 647 F.2d 224, 237 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *Cf., e.g.*, 18 U.S.C. § 892 (loansharking agreement), *id.* § 1951 (extortion agreement), 21 U.S.C. § 846 (drug distribution agreement). In analogous situations, it has been held that the limitations period does not begin to run until the accomplishment of abandonment of the objectives of the agreement, even if the last acts were committed long before. *See United States v. Grammatikos*, 633 F.2d 1013, 1023 (2d Cir.1980). Similarly, when an indictment alleges that the § 1962(d) agreement extends into the limitations period, it satisfies the requirements of the statute of limitations. *United States v. Coia*, 719 F.2d 1120, 1124–25 (11th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984).

■ In this case, the indictment alleges that the agreement continued until the filing of the indictment. The government contends that it will present specific proof at trial of McIntosh's continued participation in the enterprise at least as recently as 1983. If the proof at trial shows that the enterprise was abandoned or its objectives accomplished more than five years before the indictment, the Court will then entertain a motion to dismiss by McIntosh.

In Count Two of the indictment, McIntosh is charged with committing certain substantive racketeering acts under subsection 1962(c), which does require that overt acts (racketeering acts) be committed by members of the enterprise. As with § 1962(d), the statute of limitations analysis is the same as that for similar statutes. Under 18 U.S.C. § 371, for example, in which overt acts must also be proven, the statute of limitations period begins to run from the last overt act committed by any member of the group charged. *United States v. Borelli*, 336 F.2d 376, 384–85 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Relying on this long established law under § 371, Judge Lasker has held that "[l]ike the statute of limitations for conspiracies, which runs from the date of the last overt act, the statute of limitations for violations of

[§ 1962(c)] runs from the date of the last alleged act of racketeering activity." *United States v. Field,* 432 F.Supp. 55, 59 (S.D.N.Y.1977), *aff'd mem.,* 578 F.2d 1371 (2d Cir.), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). Similarly, the Second Circuit has said that the limitations period in a § 1962(c) case begins to run from the last "overt act alleged within the limitations period." *United States v. Errico,* 635 F.2d 152, 155 (2d Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1982). In this case, the indictment alleges predicate acts occurred as recently as September, 1984. If there is no proof at trial of any acts by any member of the enterprise within the limitations period, McIntosh can renew his motion.

At this time, McIntosh's statute of limitations motion is denied.

### N. *Russo—Hearsay in Grand Jury*

■■■ Defendant Russo moves to dismiss the indictment as to him on the ground that all of the evidence concerning his involvement in the scheme to bribe a Special Agent of the Internal Revenue Service must have been hearsay because he, Russo, was never recorded on tape discussing the scheme. An indictment may lawfully be based entirely on hearsay evidence. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). In this Circuit, the use of hearsay in the grand jury, however, is impermissible, where (1) the grand jury is misled into believing that the hearsay is actually direct evidence, or (2) there is a high probability that the grand jury would not have indicted if live witnesses had testified. *United States v. Estepa,* 471 F.2d 1132, 1136–37 (2d Cir. 1972). Russo claims that the indictment is deficient under the latter exception to *Costello* because the government did not call Russo's own co-conspirators to give what Russo contends would have been exculpatory testimony. A review of the evidence, however, reveals that Russo's claim is without merit.

■■■ First, the evidence against Russo consists largely of recorded conversations between the Special Agent and Russo's co-conspirators, including Carmine Persico, McIntosh, and Cataldo. Those conversations are not hearsay; they are co-conspirator admissions under Fed.R.Evid. 801(d)(2)(E). Accordingly, their use in the Grand Jury would not offend *Estepa.*

Second, the witnesses whom Russo now says the government should have subpoenaed to testify in the grand jury—Carmine Persico, Charles "Moose" Panarella, Marc Rosenberg, Cataldo, Stephen LoMangino, and Victor Puglisi—all were targets of the grand jury's investigation. Indeed, all of them were indicted for engaging in the same scheme to which Russo pleaded guilty. Consequently, it is highly unlikely that any of them would have testified at all, let alone in a manner that would have exculpated Russo.

Third, with the exception of Puglisi, who has been missing since shortly after he was indicted with Russo in the Eastern District of New York, all of the allegedly exculpatory witnesses themselves were convicted of the scheme to which Russo pleaded guilty. Thus, it is again highly unlikely they would have proven to be exculpatory witnesses. Russo, therefore, has no basis under *Estepa* to challenge the indictment.

Accordingly, Russo's motion to dismiss the indictment against him is denied.

### O. *Remaining Motions of Alphonse Persico*

#### 1. *Motion to Dismiss for Insufficient Evidence*

Alphonse Persico claims that the indictment should be dismissed as to him for insufficient evidence. Such a mention is not proper until the close of the government's case at trial, Fed.R.Crim.P. 29(a), and so must be denied.

#### 2. *Motion to Dismiss for Delay in Indictment*

Alphonse Persico also claims he should have been indicted in the first, rather than superseding, indictment in this case. It is well established, however, that statutes of limitations, which "provide predictable, legislatively enacted limits on prosecutorial de-

lay," *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977), afford "the primary guarantee against bringing overly stale criminal charges." *United States v. Ewell*, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966) (*quoted in United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971)). The Second Circuit has ruled that "pre-indictment delay transgresses due process limits only when there is a showing of actual prejudice to the defendant's right to a fair trial and unjustifiable Government conduct." *United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979); *see, e.g., Lovasco*, 431 U.S. at 795, 97 S.Ct. at 2051; *United States v. Snyder*, 668 F.2d 686, 689 (2d Cir.), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982); *United States v. Watson*, 599 F.2d 1149, 1155 & n. 3 (2d Cir.1979), *modified sub nom. United States v. Muse*, 633 F.2d 1041 (2d Cir.1980) (en banc), *cert. denied*, 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981); *United States v. Mejias*, 552 F.2d 435, 443 (2d Cir.), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977); *United States v. Eucker*, 532 F.2d 249, 255 (2d Cir.1976), *cert. denied*, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 757 (1977).

■ In order to .satisfy the second requirement of this two-pronged test, defendant must establish that the prosecutorial conduct causing the delay was "so unfair as to violate fundamental concepts of fair play and decency." *United States v. Rubin*, 609 F.2d 51, 66 (2d Cir.1979), *aff'd*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *United States v. Ricco*, 549 F.2d 264, 272 (2d Cir.), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977); *Eucker*, 532 F.2d at 255. In this case, Persico does not suggest that he suffered any prejudice and he fails to establish unjustifiable government conduct. Accordingly, his motion is denied.

### 3. *Motion to Dismiss Racketeering Act 44*

Alphone Persico claims that Racketeering Act 44 charges a gratuity, rather than bribery, and therefore is not "within the enumerated crimes" in 18 U.S.C. § 1961. However, all acts chargeable under statutes enumerated in § 1961 are RICO predicates, *Ruggiero*, 726 F.2d at 919–20, and, in Racketeering Act 44, Alphonse Persico is charged with two acts which are both chargeable under such an enumerated statute (18 U.S.C. § 201(b) and (f)). Therefore, his motion is denied.

### P. *Remaining Motion of Frank Falanga*

■ Defendant Falanga moves to dismiss several of the charges against him on the ground that they are legally insufficient. He claims that Racketeering Act 23 and Count 25 of the indictment do not set forth a Taft-Hartley Act violation because Falanga is not an employer or a labor official under 29 U.S.C. § 186(b)(1). Falanga, however, is also charged in both Racketeering Act 23 and Count 25 with violating 18 U.S.C. § 2, the aiding and abetting statute. It has been held that one who is not himself an employer or labor official, but who aids and abets one who is in such a position, may properly be charged with violating 29 U.S.C. § 186(b)(1). *United States v. Inciso*, 292 F.2d 374, 377–78 (7th Cir.), *cert. denied*, 368 U.S. 920, 82 S.Ct. 241, 7 L.Ed.2d ·135 (1961); *see United States· v. Overton*, 470 F.2d 761, 765 (2d Cir.1972). Thus, Falanga is properly charged in Racketeering Act 23 and Count 25 with aiding and abetting unlawful labor payoffs to officials of various unions.

■ Falanga also claims that Racketeering Act 24 is insufficient on the ground that New York Penal Law Section 180.15 only forbids labor bribery by employers. The statute says the bribe may be made by any "person." While the published cases cited by Falanga did involve employers, *People v. Dioguardi*, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960); *Hornstein v. Paramount*, 292 N.Y. 468, 55 N.E.2d 740 (1944), the cases do not suggest that the statute was intended to cover only bribes by employers. Rather, *Dioguardi*

indicates, in dicta, that New York's labor bribery statute (§ 380, the predecessor to § 180.15) can be violated by any "receptive and willing donor" of a bribe. 8 N.Y.2d at 274, 203 N.Y.S.2d 870, 168 N.E.2d 683. In addition, the notion that the word "person" in § 180.15 is limited to employers is belied by the use of "person" in every other bribery statute under Article 180. *See* N.Y.Penal Law § 180.00 (commercial bribery); *id.* § 180.40 (sports bribery); *id.* § 180.55 (rent gouging). The Court is unwilling to accept the unlikely proposition that commercial and sports bribery is only outlawed for employers. Thus, it cannot accept Falanga's contention that only employers come within the reach of § 180.15. Falanga, therefore, is properly charged in Racketeering Act 24.

Finally, Falanga claims that he cannot be charged with Racketeering Act 47, and Counts 37 and 43, which relate to extortionate extensions and collections of credit under 18 U.S.C. §§ 892 and 894. As to Act 47, he claims it is a conspiracy which cannot be charged as a predicate under 18 U.S.C. § 1962. While conspiracies under the general conspiracy statute, 18 U.S.C. § 371, cannot be RICO predicates, because § 371 does not appear in a list of statutes in 18 U.S.C. § 1961 that can be so used, any act, including a conspiracy, charged under a statute that is listed in § 1961 can be a RICO predicate. *Ruggiero,* 726 F.2d at 918–20. Falanga is charged with a conspiracy to make extortionate extensions and collections of credit, not under 18 U.S.C. § 371, but under the conspiracy language within 18 U.S.C. §§ 892 and 894, any violation of which, including a conspiracy, can be RICO predicate because §§ 892 and 894 are listed in § 1961. *Ruggiero,* 726 F.2d at 920.

 As to Act 47, as well as Counts 37 and 43, Falanga also claims insufficiency because of the absence in the pleading of overt acts. Under 18 U.S.C. §§ 892 and 894, the applicable statutes, overt acts need not be pleaded or proven in a conspiracy charged thereunder. *United States v. Smith,* 464 F.2d 1129, 1134 (2d Cir.1972)

(*citing Singer v. United States,* 323 U.S. 338, 340, 65 S.Ct. 282, 283, 89 L.Ed. 285 (1945)), *cert. denied,* 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314 (1973).

Accordingly, Falanga's motion to dismiss the above-mentioned charges is denied.

### Q. DiBella—Severance on Health Grounds

Thomas DiBella moves for a severance, pursuant to Rule 14, on the ground that the trial of this indictment poses a risk to his life that outweighs "the Government's, indeed the public's, legitimate interest in a fair and speedy disposition" of the pending charges. *Bernstein v. Travia,* 495 F.2d 1180, 1182 (2d Cir.1974). In support of his motion, DiBella submits two brief letters from his physician as well as approximately 150 pages of medical records concerning his hospitalizations at Richmond Memorial Hospital on Staten Island.

The Court has received the report of a physician appointed by agreement between DiBella and the government. Based on that report, the Court concludes that DiBella's health precludes his being tried at this time. His motion for severance, therefore, is granted. The defendant is advised that, if and when his health permits, he must stand trial. The period until such date shall be excluded in computing the time for Speedy Trial purposes, as the defendant is physically unable to stand trial. 18 U.S.C. § 3161(h)(4).

### R. Production of Thomas Agro

Both Carmine Persico and Alphonse Persico seek the issuance of a writ of *habeas corpus ad testificandum* for the production in this District of Thomas Agro. Agro, an unindicted co-conspirator in Racketeering Acts 45 and 46 of Count One, the corresponding Racketeering Acts 45 and 46 of Count One, the corresponding Racketeering Acts of Count Two, and Count Thirty-Six, is being held without bail in the Dade County, Florida Metropolitan Correctional Center. On June 26, 1985, Agro pleaded guilty to racketeering in the United States District Court for the Southern District of Florida during jury selection for his

trial on that and other charges unrelated to this case.

If defense counsel wish to interview Agro immediately, they may travel to Florida to do so. If defense counsel wish to call Agro as a witness at trial, as an unindicted co-conspirator, the government has stated that it would not oppose issuance of the requested writ. The government, however, opposes his immediate transfer to New York because of the unnecessary burden on the jail in this district and because his presence is not needed here as a defense witness for several months—until at or near the conclusion of the government's case. At oral argument, even defense counsel conceded the absence of any necessity for an immediate transfer.

Accordingly, the motion for a writ of *habeas corpus ad testificandum* for Thomas Agro is denied with leave to renew at an appropriate time after commencement of trial.

### S. *Motion to Dismiss Racketeering Acts 34, 53, 54 and 56*

Carmine and Alphonse Persico move to dismiss Racketeering Acts 34 (restaurant bribery), 53 and 54 (possession of property stolen from interstate commerce), and 56 (narcotics) as not within the scope of the enterprise. If this is a claim addressed to the face of the indictment, the enterprise is defined in paragraphs 2–4 thereof to include each of the activities covered in the above-mentioned Racketeering Acts. *E.g.,* Paragraph 2a.(2) (restaurant bribery), 2a.(4) (theft and sale of goods from interstate commerce), and 2a.(6) (sale of narcotics). If the claim is addressed to the government's proof at trial, it must await the close of the government's case. Fed.R. Crim.P. 29(a).

### T. *McIntosh—Similar Acts*

McIntosh seeks an order requiring the government to disclose in advance of trial its intention to offer evidence of prior or subsequent similar acts pursuant to Fed.R. Evid. 404(b). The government has stated that, at the present time, it does not intend to offer evidence of uncharged crimes or similar acts as are contemplated by Rule

404(b). Should its intentions change, the government is directed to notify counsel in advance of trial so as to permit the defense a "reasonable opportunity" to meet the allegations. *United States v. Baum,* 482 F.2d 1325, 1332 (2d Cir.1973).

### U. *Petite Policy*

■ Defendants Carmine Persico and McIntosh contend that this prosecution is barred by the *Petite* policy of the Department of Justice, under which "offenses arising out of a single transaction should be alleged and tried together and should not be made the basis of multiple prosecutions," *Petite v. United States,* 361 U.S. 529, 530, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960) (per curiam). The government asserts that a RICO prosecution, such as this case, does not violate the policy. Regardless of that issue, the policy is simply an internal housekeeping rule of the Department of Justice, the violation of which would not entitle defendants to dismissal of the indictment. *United States v. Booth,* 673 F.2d 27, 30 (1st Cir.), *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982); *United States v. Snell,* 592 F.2d 1083, 1087–88 (9th Cir.), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). Accordingly, this motion is denied.

### V. *Audibility Hearing*

Defendants Langella, Scarpati and McIntosh request an audibility hearing with respect to certain unidentified tape recordings. Should they wish to pursue this request, they should submit a specific list of those recordings that they claim are inaudible, together with an explanation of the asserted problem with each such recording and how much of the recording is affected. This list should be submitted by October 7, 1985 and the government should respond by October 9, 1985. Should the Court deem hearings necessary, they will be held immediately thereafter.

### W. *Limited Voir Dire and Anonymous Jury*

The government moves for an order: (i) limiting *voir dire* examination of prospec-

tive jurors so that no venireman's name, address, or place of employment is disclosed; (ii) at trial, keeping the jurors together during recesses and having the United States Marshal's Service take them to lunch as a group; and (iii) at the end of each trial day, having the United States Marshal's Service transport the jurors as a group to an undisclosed central location, from which they can depart for their respective communities. Defendants oppose this motion on the ground that such procedures will be prejudicial and deprive the defendants of their presumption of innocence. For the reasons stated below, the government's motion is granted.

The Second Circuit considered the propriety of an anonymous jury first in *United States v. Borelli*, 336 F.2d 376 (2d Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). In *Borelli*, several jurors had received unsigned letters directing them to find the defendants guilty and containing what the jurors considered to be veiled threats for noncompliance. Judge Friendly, writing for the court in dictum, declared:

> The incident.... demonstrates the need for precautions assuring that the addresses, and perhaps even the names, of jurors in cases such as this [multi-defendant narcotics case] will be held in confidence; courts must protect the integrity of criminal trials against this kind of disruption, whether it emanated from defendants' enemies, from their friends, or from neither.

336 F.2d at 392.

The Second Circuit issued its seminal opinion in this area in *United States v. Barnes*, 604 F.2d 121 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). In *Barnes*, the court rejected defendants' contention that jurors have an obligation to publicly disclose their identities and take responsibility for their decisions. The court explained its reasoning as follows:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If "the anonymous juror feels less pressure" as the result of anonymity (J.Br. 28), this is as it should be—a factor contributing to his impartiality. The court's decision as to anonymity and sequestration comported with its obligation to protect the jury, to assure its privacy, and to avoid all possible mental blocks against impartiality.... If the giving of names and addresses had been required so that investigation could have been made in the neighborhood or from their families as to their characteristics, any semblance of an impartial jury would have been destroyed. Fear of retaliation against themselves or members of their families would inevitably have been uppermost in their minds during their deliberations.

604 F.2d at 140–41.

Most recently, the Second Circuit, in *United States v. Thomas*, 757 F.2d 1359 (2d Cir.1985), recognized that impanelling an anonymous jury could burden the presumption of innocence. 757 F.2d at 1363. Nevertheless, the Court held that "there is no *per se* rule that it may not be burdened." *Id.* at 1364. The court explained:

> Unlike having an accused wear jail garb, protection of jurors is vital to the functioning of the criminal justice system. As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict. Justice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken.

*Id.*

 While the impanelling of an anonymous jury is frequently upheld, *see e.g., United States v. Fisher*, 83 Cr. 150 (S.D.N.Y.1983), *aff'd sub nom. United States v. Thomas*, 757 F.2d 1359, 1362–65 (2d Cir. 1985); *United States v. Rosado*, 82 Cr. 463 (E.D.N.Y.1983), *aff'd*, 728 F.2d 89, 94–95

(2d Cir.1984); *see also United States v. Gibbons*, 602 F.2d 1044, 1050–52 (2d Cir.), *cert. denied*, 444 U.S. 950, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979), any application to do so must be carefully considered to protect the defendants from any risk of undue prejudice. *Thomas*, 757 F.2d at 1363, 1365. The Court must balance government's interest in safeguarding jurors against the defendants' interest in avoiding erosion of the presumption of innocence. *Id.* at 1365. In conducting this analysis, the Court must look to the following factors: (i) whether defendants are alleged to have engaged in "dangerous and unscrupulous conduct," *Barnes*, 604 F.2d at 141, with particular consideration of whether such conduct was part of a "large-scale organized" criminal enterprise, *Thomas*, 757 F.2d at 1364, (ii) whether defendants have engaged in past attempts to interfere with the judicial process, *id.* at 1365, and (iii) whether there has been a substantial degree of pretrial publicity, *Barnes*, 604 F.2d at 141, *see United States v. Shakur*, SSS 82 Cr. 312 (KTD), slip op. at 7–11 (S.D.N.Y. March 29, 1983), such as to enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public, *see Borelli*, 336 F.2d at 392.

### 1. *Seriousness of Offenses Charged*

The indictment charges that the defendants constitute the leadership, and key associates, of the Colombo Family, an entity that allegedly existed to obtain money for its membership in a variety of illegal and violent ways. (Indictment ¶¶ 2–3). Three of the defendants are charged with having functioned, at different times, as "boss" of the Family (*id.* ¶ 4a); six are alleged to be or have been captains or "capos" of the Family (*id.* ¶ 4b); and the other defendants are alleged to be or have been members or important associates of the Family (*id.* ¶ 4c-f).

Eight of the defendants are alleged to have been engaged in a loansharking operation (*id.* ¶ 4g), which the government describes as "violent ... [and] dependent upon the power, money and public fear of the Colombo Family to raise funds for loans, to collect extortionate interest payments, and to take the homes and property of the victims when they could no longer make their required weekly interest payments." (Affidavit of Alan M. Friedman, Special Attorney for the United States Department of Justice, Organized Crime Strike Force, ¶ 7 at 6 ("Friedman Aff."); *see* Indictment ¶ 3f). The government also alleges that, through its domination of various labor unions, the Family put employers and prospective employers in "fear of violence [and] labor troubles" as a means of extorting payoffs. (Indictment ¶ 3d).

The members of the Colombo Family allegedly "threatened and assaulted people to induce fear in those with whom they did business" (*id.* ¶ 3c) and kept "persons outside the Colombo Family in fear of the enterprise and its racketeers by identifying the enterprise with organized crime, as well as by threats, beatings and murder" (*id.* ¶ 2c). In essence, the government alleges that the defendants are "very dangerous individuals engaged in large-scale organized crime ... [and are] part of a group that possesse[s] the means to harm jurors." *Thomas* 757 F.2d at 1364–65.

### 2. *Acts Which Indicate Willingness to Corrupt the Judicial System*

There is also reason to believe that the defendants and their associates would be willing to use improper and unlawful influence to obstruct the proceedings. In racketeering acts 36 through 46, seven of the defendants are charged, in one respect or another, with bribery of public officials, including a Special Agent of the Internal Revenue Service and an official of the Bureau of Prisons at the Federal Correctional Institution in Ashland, Kentucky. These various bribery schemes, allegedly undertaken with Colombo Family crime money for the purpose of benefiting Family members, have involved attempts to prevent the commencement of various state and federal criminal prosecutions, to procure the issuance of false writs in the name of a United States District Court, to initiate or

prevent the transfer of defendant Carmine Persico to or from federal prison in New York City, and to procure for him other unwarranted benefits, and to unlawfully influence the disposition of Carmine Persico's application to vacate his sentence through the presentation of false and fraudulent evidence to a United States District Judge. The allegations contained in several of these racketeering acts have already been the subject of guilty pleas in the Eastern District of New York by four of the defendants. *See Persico,* slip op. at 4–6. Thus, they must be viewed even more seriously than other allegations in the indictment.

The Court would further note that several of the defendants were late in appearing after indictment. Most notably, two of the lead defendants, Carmine Persico and Montemarano, were fugitives for almost four months. After a nationwide manhunt, they were ultimately apprehended at gunpoint by dozens of federal agents on Long Island. *See United States v. Montemarano,* (JFK), slip op. at 2 (S.D.N.Y. May 9, 1985).

Given the serious nature of the charges in the instant indictment, the potential for substantial incarceration upon conviction, and the Colombo Family's history of attempting to corrupt and obstruct the law enforcement and judicial processes, the Court concludes that the possibility of further efforts to frustrate justice is real and substantial.

### 3. *Publicity*

The print and electronic news media extensively reported the arrests in this case and have continued to follow the proceedings closely. Similar publicity may well occur at trial. Without an anonymous jury, jurors could be located by reporters. This could compromise the fairness of the trial. Indeed, defense counsel, who have sought a gag order, recognize the possible prejudice to their clients that could result from media coverage of this case.

In view of the violent acts alleged to have been committed in the normal course of Colombo Family business,[5] the Family's willingness to corrupt and obstruct the criminal justice system, and the extensive publicity this case is expected to continue to attract, the Court concludes that the government's interest in safeguarding jurors outweighs the defendants' interest in avoiding any possible erosion of the presumption of innocence. In fact, "[i]t would be nothing short of irresponsible were a trial judge sitting in New York City to close his eyes to these circumstances." *Barnes,* 604 F.2d at 141.

[68] Under the authority of *Borelli, Barnes* and *Thomas,* and consistent with the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York,[6] the government's motion for limited *voir dire* and an anonymous jury is granted.

Despite this order limiting *voir dire* examination of prospective jurors, the Court fully recognizes its obligation to engage in "some questioning as to identifiable issues connected in some way with persons, places, or things likely to arise during the trial." *Barnes,* 604 F.2d at 139. To that end, the parties are directed to submit proposed *voir dire* questions to the Court by 5:00 P.M. on October 10, 1985.

In explaining the anonymous jury procedures to the veniremen, this Court would propose to use an explanation roughly equivalent to that employed by Judge Pollack in *Fisher,* and subsequently approved by the Second Circuit in *Thomas,* 757 F.2d at 1365 & n. 1. Basically, Judge Pollack

---

5. In various *ex parte* submissions, the government has described the danger to its witnesses in this case. One government affidavit alleges that several government witnesses have been targeted for execution by one or more of the named defendants.

6. Article VII, section B of the Plan states that:

> The names of these [persons] shown shall not be made public until the jurors have been summoned and have appeared at the Court House. Even then the Chief Judge or the trial judge for whom a panel is shown may order the names kept confidential if the interests of justice so require.

880

told the jurors that he was keeping their identities anonymous to prevent a curious media from prying into their personal affairs or interfering with their sworn duty to consider only the evidence when deciding the case. *Id.* at 1365 n. 1; *cf. Rosado,* 728 F.2d at 94–95 (trial court explanation to jurors that reason for using anonymous jury was because of the case's connection to "persons using violence to achieve political objectives" was upheld because trial court added repeatedly that it had "nothing to do with these defendants themselves. It has to do with other people not here before the Court."). This will minimize the potential for prejudice to defendants. *Thomas,* 757 F.2d at 1365. Any comments on this proposal should accompany proposed *voir dire* questions.

██ The government also requests that jurors be segregated at lunch and recesses, under the protection of Marshals, and that, at the end of each trial day, Marshals transport the jurors to an undisclosed central location, from which the jurors could return to their respective communities. Under the circumstances of this case, the Court can hardly let the public mingle freely with jurors at every recess or the end of the trial day. This would ignore the importance of impanelling an anonymous jury and vitiate the efficacy of using that procedure. Sequestration, however, would impose substantial hardships on all involved, particularly in view of the three to four month estimated length of this trial, and sequestration should be a last resort.[7] *Shakur,* slip op. at 7. The government's proposed procedure offers a fair and prudent middle-course to follow. By minimizing the burden on jurors, yet insulating them from intimidation or harassment, jurors will be less likely to harbor resentment against the defendants or the government and be most able to render a fair and impartial verdict.

Surely, it is within the Court's power to order such procedures. *Cf. United States v. Arroyo-Angulo,* 580 F.2d 1137, 1142 (2d

Cir.) (jurors provided with special entrance to courtroom "to secure their privacy and protection"), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978). Indeed, this Court has the responsibility to provide for the protection of jurors and, as the Second Circuit stated:

It can be no answer that no untoward event had occurred up to the opening of the trial. The trial judge had to take such steps as might be necessary in advance to avoid such an event. Cases need not be cited to prove the adage of the futility of locking the barn door after the horse has escaped.

*Barnes,* 604 F.2d at 137.

For the foregoing reasons, the government's motion for an anonymous jury and segregation of the jury, as described above, is granted.

SO ORDERED.

---

7. The Court, of course, will issue a sequestration order for good and sufficient cause and if there

is no reasonable alternative by which to guarantee a fair trial and the safety of the jurors.