OPINION OF THE COURT
Charles A. Kuffner, J..
The defendant, Jose Ortiz (Ortiz), stands indicted for murder in the second degree (Penal Law § 125.25 [1]). By motion of August 31, 1988, defendant seeks an order denying the prosecution’s use on its direct case of statements made by Ortiz as part of his previous guilty plea to assault in the first degree.
The motion is granted.
On March 31, 1985, Ortiz had an argument with his *748 brother-in-law, Fred Martinez, in front of the Martinez home. The confrontation ended with Martinez’s death when Ortiz pulled out a handgun and shot him repeatedly. The first three shots were fired in rapid succession. After "walking away for a while”, Ortiz returned and continued to shoot him until the "gun was empty.” Ortiz left the scene; Martinez was rushed to a local hospital, where he suffered respiratory distress, and paralysis from the neck down. He remained in this condition for three years until he died on July 5, 1987.
Ortiz was eventually apprehended and indicted on May 24, 1985, for attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]), assault in the first degree (Penal Law § 120.10 [1]), criminal possession of a weapon in the second degree (Penal Law § 265.03), and criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]). Pursuant to a plea arrangement entered into with the prosecution and this court (the Honorable Norman Felig, presiding), Ortiz pleaded guilty to assault in the first degree (Penal Law § 120.10) in full satisfaction of the indictment. As part of his plea allocution, Ortiz made several factual admissions. The pertinent parts of his allocution are reproduced herein:
"Q. What is your name?
"A. Jose Ortiz. * * *
"Q. Did you discuss this case with Mr. Stern?[1]
"A. Yes, Sir. * * *
"Q. Did Mr. Stern advise you of your rights?
"A. Yes, Sir. * * *
"Q. You heard what [Mr. Stern] just said, that you wish to withdraw your plea of not guilty to this indictment and plead guilty to the Class C. Felony of Assault in the 1st Degree, as charged in the * * * indictment, in full satisfaction of all four counts of this indictment.
"A. Yes Sir. * * *
"Q. Do you understand that under the law, there is no obligation on your part to incriminate yourself by pleading guilty, do you understand that?
"A. Yes Sir.
"Q. Do you understand that you have a right to a trial either with or without a jury?
"A. Yes Sir. * * *
*749 "Q. Also at a trial, you would have an opportunity if you so wished, to testify as a witness in your own behalf, do you understand that?
“A. Yes, Sir. * * *
"Q. However, you understand that once you plead guilty, there will be no trial, you realize that?
"A. Yes, Sir. * * *
"Q. You are waiving all defenses that you may have to these charges, do you understand that?
"A. Yes Sir. * * *
"Q. Do you understand also that by pleading guilty, you are giving up your right to make any motions * * * to any hearings that you may have been entitled to, do you understand that too?
"A. Yes Sir. * * *
"Q. Are you pleading guilty because you are guilty of this charge?
"A. Yes, Sir.”
After sufficiently advising Ortiz of the constitutional rights which he had relinquished by pleading guilty (see, Boykin v Alabama, 395 US 238 [1969]), Justice Felig inquired as to what transpired on March 3, 1985. The following excerpt contains the colloquy between Ortiz and the court which the prosecution seeks to use in its direct case in the murder prosecution:
"Q. Did you on or about March 31, 1985, in the County of Richmond, with the intent to cause serious physical injury to another person, cause such injury to a person by the name of Fred Martinez, by means of a deadly weapon?
"Q. Are you guilty of that charge?
"A. Yes, sir.
"Q. Where did this take place?
"A. 195 Steuben Street.
"Q. Was it out in the street or in a house or where?
"A. Outside the house.
"Q. Was this during the day or at night?
"A. Night time.
"Q. Who was Fred Martinez?
"A. He is my brother-in-law. * * *
"Q. What did you do exactly?
*750 "A. I have an argument with him, and he swings at me, . that is what happened. * * *
"Q. What did you do to him?
"A. I tried to defend myself.
"Q. What did you do to him?
"A. I shot him.
"Q. How many times?
"A. I don’t know.
"Q. More than once, right?
"A. Yes, sir.
"Q. Isn’t it a fact that you shot him two times, at least, or three times, walk away and come back and shoot him again?
"A. No
"Q. That is not true?
"A. Yes, sir, no.
"Q. It is true or not true?
"A. Not true.
"Q. If you don’t tell me the truth, I am not taking the plea.
"A. No, I am telling you the truth. * * *
"A. The whole five shots came out at the same time.
"Q. They came out. You pulled the trigger once and five bullets came out; is that what you are telling me?
"A. I shot him the same thing, at once.
"Q. But you shot him how many times?
“A. About five times.
"Q. You emptied the gun, isn’t that so?
"A. Yes, sir.
"Q. In fact, you shot once and nothing came out because there was no more bullets left, isn’t that so?
"A. Yes, sir.
"Q. By shooting him, did you intend to cause serious physical injury to him?
"Was that your intention?
"A. Yes. * * *
"The Court: I forgot to ask you one question.
"At the time you shot Mr. Martinez, did he have your weapon in his hands?
"The Defendant: The weapon I used belonged to him.
"The Court: The weapon you used you took from him?
*751 "The Defendant: Yes, sir.
"The Court: But at the time you shot him five times, sir, did he have anything in his hands?
"Did he have a weapon?
"The Defendant: I don’t know.
"The Defendant: No.
"The Court: You did not, all right.
"The Defendant: No.
"The Court: You did not, all right.”
Satisfied that Ortiz freely and voluntarily pleaded guilty, and that defense counsel had adequately discussed the plea decision with Ortiz, the court accepted the plea and set date for sentencing. On July 18, 1985, Ortiz was sentenced as a predicate felon to a maximum of 10 years’ and a minimum of 5 years’ incarceration at a State facility.
The victim, Martinez, remained in the hospital from the date of the shooting, March 31, 1985 until July 5, 1987 when he died. Martinez never recovered from the shooting, and was never released from the hospital. At the time of his death, he was paralyzed from the neck down.
Upon Martinez’s death, the prosecution, pursuant to CPL 40.20, secured an indictment of Ortiz for murder in the second degree (Penal Law § 125.25 [1]). The prosecution seeks permission to use, at the murder trial, as evidence in its case-in-chief the factual admissions Ortiz made as part of his guilty plea to the assault charge. Consequently, the issue now before this court is whether it is permissible to use the allocution made by a defendant in one proceeding against him in another proceeding, where the defendant has not been advised of its potential use against him subsequently, and where the subsequent proceeding involves the same res gestae.[2]
DISCUSSION
Before a court accepts the defendant’s guilty plea, there must be an "affirmative showing that it was intelligent and voluntary.” (Boykin v Alabama, 395 US 238, 242 [1969].) Several constitutional rights are involved in a waiver that takes place when a plea of guilty is entered. First, is the *752 privilege against compulsory self-incrimination guaranteed by the Fifth Amendment. (Malloy v Hogan, 378 US 1.) Second, is the right to trial by jury. (Duncan v Louisiana, 391 US 145.) Third, is the right to confront one’s accusers. (Pointer v Texas, 380 US 400.) Because of the importance of these rights, a court must “canvass * * * the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence.” (Boykin v Alabama, 395 US, supra, at 244.) Because Ortiz was never warned that his allocution would be used against him in a later murder trial, this court is not convinced that Ortiz could have understood and appreciated the consequences of his plea.
While there is no “precise, ritualistic catechism” for the admonitions that a court must give to the defendant before accepting a plea of guilty (People v Nixon, 21 NY2d 338 [1967]), the defendant must fully understand the direct consequences of his guilty plea. (Boykin v Alabama, supra, at 242.) Collateral consequences of a guilty plea, however, “need not be explained to the defendant to ensure that the plea is voluntary.” (United States v Russell, 686 F2d 35, 38 [DC Cir 1982].) While the distinction between collateral and direct consequence of a criminal conviction is "obvious at the extremes and often subtle at the margin” (supra, at 38), loss of a civil service job as a result of a felony conviction (see, United States v Crowley, 529 F2d 1066, 1072 [3d Cir], cert denied 425 US 995 [1976]), loss of the rights to vote and travel abroad (see, Meaton v United States, 328 F2d 379, 380 [5th Cir 1964], cert denied 380 US 916 [1965]) and possible deportation (see, Fruchtman v Kenton, 531 F2d 946 [9th Cir], cert denied 429 US 895 [1976]), constitute collateral, rather than direct consequences of guilty plea.
The prosecution’s use of Ortiz’s allocution against him in a subsequent murder trial is a direct consequence of his guilty plea, and a consequence of which Ortiz should have been alerted. Because Ortiz was not informed of its potential use against him, this court cannot conclude that Ortiz had full knowledge of the direct consequences of his plea. Rather, as the defendant urges, this court is persuaded that at least a reasonable probability exists that had Ortiz been advised by the court, the District Attorney, or his own attorney that his in-court admission could be used in evidence against him to later prove a more serious charge of murder, he probably would not have relinquished his right to remain silent, and entered the guilty plea in the assault case.
*753 Moreover, the Federal case law presented by the prosecution is unpersuasive. The prosecution relies extensively on United States v Persico (621 F Supp 842 [SD NY 1985], affd 774 F2d 30 [2d Cir 1985]) in which the Government was permitted to establish the requisite RICO predicate act offenses by using evidence of the defendant’s prior guilty plea and resultant conviction. In affirming the District Court’s analysis, the Second Circuit Court of Appeals ruled that a defendant need only be advised concerning the direct consequence of a guilty plea, and thus, the defendant did not have to be advised that the "conduct underlying the plea may become a predicate act for criminal offenses [committed] by the defendant after the date of such conduct.” (United States v Pérsico, supra, at 33.) Implicit in the Second Circuit’s analysis, therefore, was the finding that use of the guilty plea and resultant conviction to establish RICO liability was a collateral rather than direct consequence.
This court declines to apply Persico (supra) for several reasons. First, unlike the case at bar, the subsequent proceeding in Pérsico involved an entirely distinct legal offense, involving a different res gestae from the first offense. (Persico, supra, at 30.) In the case at bar, the defendant has simply been "indicted up” from assault to murder. The conduct which formed the basis of the assault proceeding, namely, the shooting of Martinez, is precisely the conduct which forms the basis of the murder trial. Second, and perhaps more importantly, the legislative history of the RICO statute explicitly provides for the use of prior convictions, obtained pursuant to plea agreements, to aid in establishing a pattern of racketeering activity. (See, supra, at 32; see also, e.g., United States v Phillips, 664 F2d 971, 1009, n 55 [5th Cir 1981], cert denied sub nom. Platshorn v United States, 459 US 906 [1982].) Third, the prosecution in Pérsico sought only to introduce evidence of the conviction to establish RICO predicate act liability. (United States v Persico, supra, at 30.) It seemingly did not seek to read the defendant’s prior allocution to the jury, as the prosecution seeks to do here.
Finally, the Pérsico court’s analysis is based on application of rule 11 of the Federal Rules of Criminal Procedure. Rule 11 (c) (5), however, requires that the defendant be advised that any statements made by him when pleading guilty may "later be used against him in a prosecution for perjury or false statement.” If the statute requires such a warning with regard to a subsequent perjury proceeding, it seems incongruous not *754 to require the same warning with regard to a subsequent more serious murder proceeding. In any event, for the reasons set forth above, this court declines to follow Persico (supra).
In addition to questioning the voluntariness of Ortiz’s guilty plea, this court also finds that admission of Ortiz’s allocution would violate his Fifth Amendment right against self-incrimination. Were this court to admit the factual admissions made by Ortiz at the assault proceeding against him at the pending murder trial, this court would, in effect, be compelling Ortiz to incriminate himself at the murder trial in violation of his constitutional right. (See, Kastigar v United States, 406 US 441 [1972] [Fifth Amendment right against self-incrimination precludes the prosecution from using statements made by defendant under legal compulsion].)
Moreover, while Ortiz waived his Fifth Amendment right when he pleaded guilty, his waiver refers to that proceeding only. (People v Sobotker, 61 NY2d 44, 48 [1984].) Simply by waving his Fifth Amendment right at the assault proceeding, Ortiz cannot be deemed to have "automatically waive[d his] constitutional right against self incrimination in all subsequent proceedings.” (People v Sobotker, supra, at 48.) Quite the contrary, the New York Court of Appeals has explicitly recognized that a defendant has a "legitimate interest in preserving and asserting his Fifth Amendment rights with respect to an offense for some time following a plea of guilty.” (People v Sobotker, supra, at 48.) Furthermore, as long as a possibility exists that statements made in plea proceedings may be used against the defendant,[3] the defendant maintains an interest in preserving his Fifth Amendment right. (People v Sobotker, supra, at 48.) Thus, absent an " ' "intentional relinquishment or abandonment” ’ ” by Ortiz in the murder trial of his Fifth Amendment right against self-incrimination (Boykin v Alabama, supra, at 243, n 5; Johnson v Zerbst, 304 US 458, 464 [1938]), this court is unwilling to presume a waiver of such an important constitutional right.
Finally, in analyzing a situation in which a guilty plea had been withdrawn, the New York Court of Appeals held that admissions made during the plea allocution were not admissible at trial on the issue of guilt. (People v Moore, 66 NY2d 1028, 1030 [1985].) While this court recognizes that Ortiz’s guilty plea has never been withdrawn, or set aside on appeal, *755 the analysis used by the Moore court is instructive. Examining what each party bargained for in the plea, the court found that use of the plea allocution in the event the plea was later withdrawn was "not something the People * * * bargained for”. (People v Moore, supra, at 1030.) Consequently, use of these statements "would be decidedly unfair to the defendant.” (People v Moore, supra, at 1030.)
Similarly in the case at hand, because Martinez died nearly three years after Ortiz pleaded guilty to assault, the prosecution cannot be said to have "bargained” for the use of his plea allocution as evidence in its case-in-chief in a subsequent murder proceeding. Consequently, use of the allocution against Ortiz at the murder trial would be similarly unfair. (See, People v Moore, supra, at 1030.)
CONCLUSION
For the foregoing reasons, the defendant’s motion to suppress the use of his prior plea allocution by the prosecution in its case.-in-chief at the murder proceeding is granted.

. Jack Stern, Esq. was defense counsel for Ortiz.

. Apparently this precise issue has never been addressed in this State. Furthermore, a multistate research study has failed to produce a single case in which this precise issue has been decided by any State or Federal court.

. Such statements may be used, for example if the conviction is set aside on appeal. (See, People v Evans, 58 NY2d 14, 25 [1982].)